Rondinelli v. Pittsburgh, Appellant.

Argued March 15, 1962.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*George Shorall*, Assistant City Solicitor, with him
*David W. Craig*, City Solicitor, for City of Pittsburgh,
appellant.

*James P. Gill*, with him *Edward O. Spotts*, for ap-
pellees.

OPINION BY MR. JUSTICE MUSMANNO, April 17, 1962:
On July 21, 1956, Ernest M. Rondinelli, with his
wife at his side and his three-year-old boy in the rear

seat of his 1954 two-door Ford automobile, was driving northwardly on Woodruff Street in Pittsburgh, when his car was struck by a police ambulance proceeding in the opposite direction. Mrs. Rondinelli was severely injured. Mr. and Mrs. Rondinelli brought an action of trespass against the City of Pittsburgh and recovered verdicts in the respective sums of $3,000 and $12,000. The defendant moved for judgment n.o.v., and for a new trial. Both motions were refused and the defendant appealed.

The defendant contends that it was entitled to a compulsory nonsuit in the first instance, and now to judgment n.o.v. on the basis that the defendant was not proved to have committed actionable negligence and that Rondinelli was guilty of contributory negligence as a matter of law. The record fails to offer any support to these contentions. It was about 5:30 in the afternoon of the day mentioned when Rondinelli turned left from Saw Mill Run Boulevard (Route 51), on which he had been traveling in an eastwardly direction, into Woodruff Street which, at this point climbs markedly. As he entered into Woodruff Street, which is a four-lane winding thoroughfare, he saw a police ambulance speeding toward him at from 50 to 60 miles per hour, on a steep downgrade, zigzagging and, in his eyes, apparently out of control. In its erratic advance the ambulance swung from its lane of descent over to the plaintiff's lane, then swerved back to its proper path and once again returned to the plaintiff's side of. the road, this time hitting him on the left with such violence that the ambulance itself lost balance and toppled.

The defendant argues that the plaintiff could have averted the collision if he had availed himself of the "last clear chance doctrine". The phrase is mis-employed in this connection, but assuming the image apparently intended by the defendant, it is clear that

there was no obligation on the part of the plaintiff to subject himself to the jeopardy the defendant recommends. A motorist who is thrown into a state of peril because of no fault of his own is not required to work out mathematically the possibilities of escape by hurling himself desperately into a situation which offers him the "last clear chance" of survival, but which, concomitantly, offers also a chance of complete disaster. A pedestrian on a bridge who is about to be run down by a car could possibly avoid that fate by leaping over the parapet into the river beneath and if he is a good swimmer suffer only a drenched suit of clothes, but it could happen also that he could hit some solid obstruction in the river which would kill him or despite his natatorial ability, he could even drown.

In view of the erratic driving of the ambulance driver, there was no way for Rondinelli to determine just what course the ambulance would take. Under these circumstances it would appear, and the jury agreed with him, that his best course was to do what he did, namely, remain immobile. The defendant argues that despite the manner in which the ambulance was being driven, the plaintiff had plenty of time in which coolly to appraise the situation, and his failure to avail himself of the "last clear chance" which the time at his disposal must have revealed itself vividly to his mind, convicted him of contributory negligence. The ample time which defendant's counsel envisages is italicized in the defendant's brief—*ten seconds.*

Ten seconds may be a long time in a prize fight ring when the floored pugilist is seeking to regain perpendicularity but it is a very short time within which to achieve orientation with a vehicle bearing down on one on a zigzag course at sixty miles per hour. In any event, whether the plaintiff had the time and opportunity to avert the accident was a question of fact for the jury, and we cannot say that the record would war-

rant any conclusion that they acted capriciously or contrary to instructions of the trial court.

The defendant City, in explanation of the speed at which the police ambulance careened down Woodruff Street, points to The Vehicle Code (75 PS §1002(f)) which specifies that the speed limitations in the Code do not apply to vehicles of the Police and Fire Departments when responding to emergency calls. However, the section which pronounces this liberality of accelerated movement in the interests of security and ailing humanity, also lifts its hand in warning that the vehicle must at all times be operated prudently, specifically stating that the exemption will not "protect the driver of any such vehicle from the consequences of a reckless disregard of the safety of others."

There would be a little point in an ambulance driver racing beyond the speed limit in order to get his patient to a doctor or hospital if in doing so he maneuvered his vehicle so recklessly that he collided with another vehicle, thus increasing the number of patients and aggravating the condition of the one being hastened to the hospital or making it impossible for the ambulance to get to the already injured person awaiting aid. This very case is a grim demonstration of this point because the ambulance, after hitting the plaintiff's car, overturned.

The defendant argues that, regardless of what the defendant did, its action was not the proximate cause of the accident because the plaintiff could have avoided the collision by driving to the extreme right of the road. The plaintiff testified that this was not possible: "I wanted to pull over to the right. I was afraid to because of the traffic on the right. I was afraid I'd get hit on that side. *Q. Was there traffic to your right and rear? A. Yes, sir, there was* . . . Q. Why didn't you pull over to the right? A. As I said previously, I was afraid the oncoming traffic on the right

side may hit me so I stayed where I was. *Q. Was there in fact traffic to the right of you? A. Yes, sir, there was.*" (Emphasis supplied)

The appellant contends also that the court erred in not approving its points for charge. Both parties filed numerous points for charge, which, had they all been approved, might well have so confused the jury as to make the verdict the product of sheer guesswork. The trial judge very patiently separated the wheat (as few as were the grains) from the considerable chaff and by its own charge, independent of these points, kept the jury on the path of relevancy and responsibility.

It is obvious from the record that the trial was fiercely contested all the way, and that the lawyers on either side were forensic fire-eaters, each charging the other with inflaming the jury. On the defendant's side, this is another reason it advances for a new trial. It charges that the plaintiff's counsel in his closing argument, said: "A small verdict would not be fair and reasonable."

The plaintiff has retaliated by calling attention to remarks by defendant's counsel which contained this exhortation to the jury: "They (the plaintiffs) come into court for something for nothing. Don't be a part of the give-away program. The public is burdened enough these days . . ."

A trial in an American court is distinctly an adversary proceeding and is therefore bound at times to excite counsel into making statements overladen with partiality. However, so long as decorum is maintained, and there is no leaving the highway of fact to agitate in the marshes of palpable exaggeration, unwonted characterizations, hortatory appeals to latent prejudices, and improper imputations of gross motives, there is no reason why lawyers should not be permitted to express themselves in such manner as they believe best serves the interests of justice. The responsibility

is on the trial judge to see that counsel do not transgress the bounds of what is proper, wholesome, and fair. He accomplishes this end by employing judicious suggestion and, if necessary, stern admonition.

The record in this case shows that the judge wielded a controlling gavel so that the debate did not become a shouting match, argumentation did not become invective and the demands of counsel did not transgress the legitimate goals sought by the respective parties.

With regard to the remark of a "small verdict" quoted by defendant's counsel, it is to be noted that its brief does not reproduce the context from which the quoted sentence was extracted. The record shows that plaintiff's counsel said in this connection: "As I started to say to you, anything that you have read or heard concerning verdicts or the size of verdicts you should not consider in this case. You are to decide this case upon the testimony produced during the trial of this case, upon what the Judge charges you on the law and nothing else. I want to mention that to you.

"I want to mention also that just because this is a large municipal corporation that we are suing, in and of itself, is no reason to bring in a large verdict, but on the other hand in the interest of being fair to the City, there is no reason either to bring in a small verdict. There is even-handed justice for all in our courts and that is what we ask of you in this case . . .

"Now, the Court will charge you that in view of the evidence that your verdict should be fair and reasonable. I submit to you, ladies and gentlemen, in this case that a small verdict would not be fair and reasonable."

In this verbal setting the quoted sting of the bee is not so sharp or penetrating as it seemed when quoted alone in the defendant's brief. We do not believe that the statement by plaintiff's counsel would have justified the withdrawal of a juror, especially when the

learned trial judge explained to the jury just what their responsibilities and duties were in this respect and in all other respects. (*Stassun v. Chapin,* 324 Pa. 125)

In *Contractors Lumber and Supply Co. v. Quinette,* 386 Pa. 517, this Court said: "There is nothing in the law, and certainly nothing in the history of American forensic appeal, which remotely suggests that a lawyer's summation must be a prosaic and dull affair, devoid of metaphor, empty of simile, and stranger to dramatic, poetical, or sentimental allusion. So long as no liberties are taken with the evidence, a lawyer is free to draw such inferences as he wishes from the testimony and to present his case in the light most suited to advance his cause and win a verdict in the jury box."

Finally, the defendant asks for a new trial on the basis that the verdict awarded Mrs. Rondinelli was excessive and therefore should be reduced or a new trial ordered. The record would not justify either action. We affirm in this respect what was said by the court below: "The wife hit her head on the molding in the top of their car and struck her back against the arm rest or door handle. She felt dizziness and headache. Later on in the day the muscles of her neck began to hurt and she developed low back pain. She went to a chiropractor for two or three weeks. She was getting temporary relief but no permanent improvement, then she went to Dr. Phillip Faix on August 24, 1956. Dr. Faix testified that she had neck and low back pain with limitation of motion in the neck. The neck pain cleared up after a few days, but the low back pain remained in the coccygeal region. He treated it for a long period of time and finally on April 16th to 27th, 1961, removed the coccyx by operation. He said the examination of the coccyx after removal showed a fractured second segment. He testified that the wife had

thirty percent (30%) limitation on forward and backward motion of the back, that the condition of her back was such that she would continue to have pain and would require medical treatment once a month for a couple of years. The limitation of motion of the back was a permanent condition.

"The defendant complains that it should have a new trial because the verdict is excessive. The evidence as to the long period of time during which the plaintiff suffered pain in her back, the nature of her injuries, and their permanency, indicates to us that an award of twelve thousand ($12,000.00) dollars to her as damages is not an excessive verdict."

Judgments affirmed.