Price et al., Appellants, *v.* Yellow Cab Company.

58

Argued November 30, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused June 24, 1971.

*Seymour I. Toll,* with him *B. Nathaniel Richter,* and *Richter, Syken, Ross, Binder & O'Neill,* for appellants.

*Frank M. Jakobowski,* for appellee.

*George P. Williams, III,* with him *Tom P. Monteverde,* and *Schnader, Harrison, Segal & Lewis,* for appellee.

OPINION PER CURIAM, June 1, 1971:

The judgments are affirmed by an evenly divided Court.

Mr. Justice COHEN took no part in the decision of this case.

———

OPINION BY MR. JUSTICE JONES in support of affirmance:

The facts underlying these appeals concern an automobile collision on March 15, 1959, between a vehicle operated by Richard Byram and a vehicle owned by the Yellow Cab Company in which Delores Price was a passenger. At the time of the accident Mrs. Price was pregnant with the infant Pamela Price. As a direct result of the accident, Mrs. Price suffered severe personal injuries requiring prolonged hospitalization in the Frankford Hospital. Subsequently, Pamela Price was born in Lankenau Hospital on September 23, 1959, with cerebral palsy, a massive and permanent injury to her brain and body.

Originally two actions in trespass were instituted against Richard Byram and the Yellow Cab Company: one by Mrs. Price and her husband, Martin, sought to recover damages for Mrs. Price's personal injuries; the second suit by Delores and Martin Price, as parents of Pamela Price, and by Pamela in her own right sought to recover damages for Pamela's condition and related expenses allegedly caused by the accident. The first action was terminated after a general release was signed by Martin and Delores Price on October 24, 1960, and the second, the subject matter of these appeals, was allowed to continue.

Before the trial on this second action commenced, both Yellow Cab and Byram pleaded the release signed by Martin and Delores Price as a bar to any individual recovery by them in their own right for any medical or

other expenses incurred by them in connection with the condition of their daughter. By order of the court below separate trials were mandated on the issues of liability and the effect of the release. A trial by jury on the release issue was first conducted with the trial judge eventually directing a verdict in favor of Byram and Yellow Cab (appellees). Thereafter the parties agreed that no mention was to be made of the release at the second trial.

During their opening statement in this principal, albeit second, trial, the defendants-appellees admitted concurrent negligence. This trial, therefore, involved only two questions: (1) whether the infant's admitted condition of cerebral palsy was caused by the accident; and (2) if so, the amount of damages. Thereafter the jury returned verdicts in favor of the defendants-appellees. Following disposition of post-trial motions by a court en banc, judgments were entered in favor of defendants-appellees and these appeals followed.

As justification for the grant of a new trial on the issue of liability, appellants Martin, Delores and Pamela Price assign as error certain alleged irregularities committed during the principal trial: (1) the voir dire questioning concerning Jerry Wolman, the principal owner of Yellow Cab Company at the time of trial, allegedly prejudiced the jury; (2) the admission into evidence of correspondence between appellants' key medical witness and his professional liability insurance carrier was reversible error; (3) the hypothetical question asked appellees' medical witnesses omitted a material fact; and (4) statements made by appellees' counsel during closing argument constituted gross misconduct warranting a new trial. Appellants also allege that the release issue was wrongly decided and that judgment n.o.v. should be entered. Of course, any discussion of the release issue would be unneces-

sary if there was no error in the conduct of the liability trial—if the infant could not recover for her injuries, ipso facto, the parents, in their own right, could not recover for their medical and related expenses arising from Pamela's condition.

During the questioning of prospective jurors on voir dire, appellees' counsel, with the court's approval, inquired whether any of the prospective jurors favored or disliked or were creditors of Jerry Wolman. At the time of trial Mr. Wolman, a well-known sports figure and principal owner of the Yellow Cab Company, was beset by many financial difficulties and the downfall of his financial empire was widely publicized by the Philadelphia news media. Hence the argument is presented by appellants that this line of inquiry generated sympathy for Mr. Wolman, a person with no connection whatsoever in the litigation, and effectively informed each juror that a vote for defendants-appellees was a vote for Mr. Wolman. For a variety of reasons, I do not believe there is reversible error.

In *Clay v. Western Maryland R. R. Co.*, 221 Pa. 439, 70 Atl. 807 (1908), this Court, while affirming the trial judge's *refusal* to permit an examination of jurors on voir dire whether they were employees or stockholders of a company unrelated to the litigation, noted that, "the better practice is to allow a general inquiry as to the direct or even contingent interest of jurors, in the result of the litigation, or in the parties to it, when there appears to be any reasonable ground to believe that some of them may have a possible interest in the result of the litigation, or in the parties, in order that an impartial jury may be selected, free from bias or interest." 221 Pa. at 445-46, 70 Atl. at 809. In my opinion, the court below admirably followed the practice suggested in *Clay*. Nor can I accept appellants' unequivocal characterization of Mr. Wolman as

a "popular" sports figure likely to generate sympathy. Mr. Wolman was certainly a controversial, well-known person; but whether he could be termed "popular" depends in large measure upon the particular segment of the population one addresses. Moreover, the court below specifically instructed the jurors not to let sympathy for anyone influence their deliberations.

Adopting the general rule that, "[p]rospective jurors may be questioned as to their pecuniary interest in the litigation, but the examination should not be so conducted as to convey improper and prejudicial information to the jurors," 50 C.J.S. *Juries* §275(c)(1), I cannot conclude that improper or prejudicial information was conveyed. On balance, this is an appropriate occasion for borrowing the familiar principle from the field of criminal law that, "the scope of voir dire examination rests in the sound discretion of the trial judge and his decision, even in a challenge for cause, will not be reversed in the absence of palpable error: [Citations omitted]." *Com. v. McGrew*, 375 Pa. 518, 526, 100 A. 2d 467, 471 (1953).

Appellants next complain of the receipt into evidence of correspondence between a Dr. Mitchell, his professional insurance carrier, his private counsel and appellees' counsel as well as its subsequent use during cross-examination of Dr. Mitchell. Necessary for a complete understanding of this alleged error is the fact that Dr. Mitchell, while not actually delivering Mrs. Price, was her obstetrician and that, apart from the issue of damages, the sole question involved in the principal trial was whether a causal relationship existed between the concurrent negligence of appellees and the infant's cerebral palsy. Reading the record, it becomes most apparent that appellees' trial strategy involved linking the infant's condition not with the appellees' negligence but with other factors, including any possi-

ble negligence on the part of Dr. Mitchell. Against this backdrop, appellants' counsel placed Dr. Mitchell on the witness stand and fully qualified him as an expert medical witness.

Characterized by the court below as "one of the principal medical witnesses on behalf of [appellants]," Dr. Mitchell's testimony on direct examination linked the accident with the infant's condition. During the cross-examination of Dr. Mitchell, he was asked whether he had brought certain papers and documents and he affirmatively responded. At this juncture a side-bar conference was conducted followed by an *in camera* proceeding. An examination of this correspondence revealed that Dr. Mitchell notified his professional liability insurance carrier of the possibility that a malpractice claim might be filed against him. After argument by counsel for both parties, the trial judge, over appellants' objection, not only permitted the introduction of these documents but also allowed cross-examination on this subject in order to discredit Dr. Mitchell's testimony by demonstrating a possible motive or bias for his testimony.

I begin with the well-recognized rule that evidence in a personal injury action which informs the jury that the *defendant* is insured against liability is inadmissible and an improper subject of cross-examination. *See, e.g., Trimble v. Merloe,* 413 Pa. 408, 197 A. 2d 457 (1964); *Patton v. Franc,* 404 Pa. 306, 172 A. 2d 297 (1961); *Harriet v. Dallas,* 383 Pa. 124, 117 A. 2d 693 (1955); *Dively v. Penn-Pittsburgh Corporation,* 332 Pa. 65, 2 A. 2d 831 (1938); *Kaplan v. Loev,* 327 Pa. 465, 194 Atl. 653 (1937); *Lenahan v. Pittston Coal Co.,* 221 Pa. 626, 70 Atl. 884 (1908); *Hollis v. U. S. Glass Co.,* 220 Pa. 49, 69 Atl. 55 (1908). Although the technical reason for this rule of evidence is that such information is irrelevant, the chief reason is "the assumption

64

that a knowledge of the fact of insurance against liability will motivate the jury to be reckless in awarding damages to be paid, not by the defendant, but by a supposedly well-pursed and heartless insurance company that has already been paid for taking the risk." II Wigmore on Evidence §282a, at 133-34 (3d ed. 1940). *See, also,* 29 Am. Jur. 2d Evidence §405 (1967). Accordingly, were Dr. Mitchell a defendant in this litigation, the receipt into evidence of this correspondence would be reversible error under the general rule. However, an exception to this rule has developed in this Commonwealth as well as many other jurisdictions that allows a plaintiff to question defense *witnesses* as to any interest, bias or motive arising by virtue of their relationship with the defendant's insurance carrier. *See, e.g., Corbett v. Borandi,* 375 F. 2d 265 (3d Cir. 1967); *Goodis v. Gimbel Bros.,* 420 Pa. 439, 218 A. 2d 574 (1966); *Fleischman v. Reading,* 388 Pa. 183, 130 A. 2d 429 (1957); IIIA Wigmore on Evidence §969, at 819 (Chadbourn rev. 1970); II Wigmore on Evidence §282a, at 134-35 (3d ed. 1940); Annot., 4 A.L.R. 2d 761, 779-81 (1949). In the instant appeals, neither the general rule nor its exception answers the specific issue presented: whether the plaintiffs-appellants' expert witness may be discredited by evidence which coincidentally discloses that this witness is insured.

An examination of the chief reason for this general rule—the fear that sympathetic juries would be inclined to impose liability upon the defendant and award huge sums once they become aware that the defendant will be compensated by his insurance carrier—reveals its inapplicability to the situation at bar. Since the jury cannot return a verdict against a nonparty witness, the fact that this witness is insured cannot possibly inure to the plaintiff's benefit and correspondingly prejudice the defendant. Although, as appellants

suggest, a plaintiff might possibly be prejudiced, the general rule is intended to shield the defendant and not the plaintiff. Moreover, if the jury is so inclined by its collective heart rather than its head, why would it postpone the plaintiff's financial restoration until the physician is before them? Accordingly, I believe there was no error.

However, I do not intimate that every medical witness may be cross-examined concerning his insurance coverage as such evidence must also meet the test of relevancy. Indeed, in a day and age when many insurance carriers require advance notification of any possible claims, such a rule of evidence may be unwise from the standpoint of public policy. Nevertheless, owing to the primacy of the causation issue at trial as well as Dr. Mitchell's possible responsibility for the infant's unfortunate condition, this correspondence between Dr. Mitchell and his professional liability insurance carrier is most relevant, especially since his testimony on direct examination, if believed, would absolve him of all liability.

Appellants next contend that the omission of certain facts in the identical hypothetical question asked appellees' medical experts constituted reversible error. Following the automobile accident, general anesthesia was administered and general surgery was performed on Mrs. Price at the Frankford Hospital in Philadelphia. Although contradicted by one of appellees' expert witnesses, the appellants argue that the jury could have concluded that this surgery and anesthesia were "causative insults" to the healthy development of the fetus. Nonetheless, the trial judge, after extensive argument and deliberation as to the final content and form of the hypothetical question to be presented to all four witnesses, concluded that specific mention of these facts was unnecessary. Seeking the grant of a

new trial, appellants make much ado about the general rule that, "a hypothetical question should embrace all material facts." *Karavas v. Poulos*, 381 Pa. 358, 365, 113 A. 2d 300, 304 (1955). *See, also, Donaldson v. Maffucci*, 397 Pa. 548, 558, 156 A. 2d 835, 840 (1959). For various reasons, blind adherence to this principle on these facts would be unjustified.

First, each of these witnesses testified that he was familiar with the Frankford Hospital's records concerning Mrs. Price which referred to Mrs. Price's surgery and anesthesia. In light of the fact that the hypothetical question requested an opinion not only on the basis of the specific facts set forth in the question, but also on the basis of "the additional facts appearing in the records of Frankford Hospital," these specific facts were considered by each of appellees' expert witnesses. Indeed, I am in agreement with the able opinion of the court below that the crux of appellants' argument is directed to the lack of emphasis concerning this surgery which Mrs. Price underwent. We said in *Gordon v. State Farm Life Ins. Co.*, 415 Pa. 256, 260, 203 A. 2d 320, 322 (1964) : "Defendant's counsel finds fault in plaintiff counsel's hypothetical questions on other grounds, principally that they failed to include all the pertinent factors in the case. If the particular hypothetical question under fire was inadequate or unfair, it devolved upon defendant's counsel to object in such a manner to permit plaintiff's counsel to amend the question. Moreover, defendant's counsel had full opportunity to put his own hypothetical questions to the doctors. On this subject the Superior Court said in Randolph v. Shannopin Coal Co., 142 Pa. Superior Ct. 389 : 'If opposing counsel are of the opinion that material facts are not included in a hypothetical question, they may incorporate those facts in questions asked on cross-examination, and may also frame ques-

tions involving a consideration of facts which they contend are established by the evidence.'

"Some of the evidentiary factors which defendant's counsel says should have been included in the hypothetical questions were before the court in the form of photographs which the doctors saw and could have incorporated in their knowledge of the background of the case. An expert's opinion may be predicated on 'personal observation combined with assumed facts appearing in the evidence.' Jackson v. U. S. Pipe Line Co., 325 Pa. 436, 440." This possibly causative factor was fully presented to the jury and leads me to the conclusion that there was no error.

Appellants lastly contend it was error to permit appellees' counsel to make certain remarks during summation. Since appellants voiced an objection to only one of these statements, I will consider only that statement. *See, e.g., Springer v. Allegheny County*, 401 Pa. 557, 165 A. 2d 383 (1960). *Compare, Hill v. Gerheim*, 419 Pa. 349, 214 A. 2d 240 (1965).

Once again reflecting the fact that the real issue in the principal trial involved whether Pamela's condition was due to the accident, Dr. Mitchell testified on cross-examination as to the infant's prolapsed umbilical cord, a possible cause of the cerebral palsy. Although there is some confusion as to whether appellees knew or should have known of this factor, appellees' counsel stated to the jury that, "[w]e didn't know it until we dragged it out of him under this intensive cross-examination they now wish hadn't happened because it blew their case out of the water." In this area of law, we have stated in varying language that whether a lawyer's speech exceeds the bounds of propriety is primarily a matter for the trial judge's discretion so long as decorum is maintained. *See, e.g., Leasure v. Heller*, 436 Pa. 108, 258 A. 2d 855 (1969); *Smith v. Evans*, 421

Pa. 247, 219 A. 2d 310 (1966) ; *Purcell v. Westinghouse Broad. Co.,* 411 Pa. 167, 191 A. 2d 662 (1963) ; *Rondinelli v. Pittsburgh,* 407 Pa. 89, 180 A. 2d 74 (1962). Bearing in mind that the court below could not conclude appellees should have been aware of this fact, I would adopt the thinking of the court below that, "the matter was one for comment to the jury, that there was no deliberate intent on the part of counsel to misconstrue the evidence or mislead the jury and we do not believe that these remarks constitute the type of prejudicial error which would warrant the granting of a new trial."

Overall, I am of the opinion that no reversible error was committed in the course of the principal trial on the issue of liability. For the reason stated earlier, this conclusion renders moot the issue at the first trial whether the release signed by Martin and Delores Price foreclosed their reimbursement for Pamela's medical expenses.

Mr. Chief Justice BELL and Justice POMEROY join in this supporting opinion.

OPINION BY MR. JUSTICE ROBERTS, in support of reversal:

I must dissent for it is my view that the trial court committed two errors entitling appellants to a new trial.

## I.

In procedural as well as substantive matters the judicial task of fashioning a proper rule of law almost invariably involves the weighing of competing interests. Such is the case here where this Court is asked to resolve a particular question as to the proper scope of counsel's voir dire examination of prospective jurors.

On the one hand is the manifestly strong policy of allowing a broad examination designed to disclose whether any prospective jurors have any interest in the outcome of the litigation; on the other is the equally strong and often conflicting policy demanding that the questions propounded during voir dire not convey improper or prejudicial information to the veniremen. In the instant case, the trial court erroneously struck the balance between these two policies by permitting defense counsel over plaintiffs' objection to inquire of the prospective jurors whether any of them were creditors of or had any claims against Jerry Wolman, a well known Philadelphia sports figure and the then principal shareholder of the corporate defendant Yellow Cab Company.

This line of inquiry effectively informed each juror that a vote for Yellow Cab was a vote for Wolman. Wolman is not a party to this litigation, and while there is nothing of record to substantiate appellants' assertion that he was a "popular" figure, the opinion in support of affirmance itself characterizes him as "controversial". In these circumstances there was a substantial possibility that among the veniremen were one or more individuals sympathetic toward Wolman, and defense counsel's implicit suggestion to the jurors that Wolman's fortunes were tied to those of Yellow Cab created the unfortunate opportunity for such sympathy to influence the ultimate verdict.

Nor were these inquiries concerning Wolman necessary to protect Yellow Cab Company's interests. If any of the prospective jurors were indeed creditors of or claimants against Wolman, their bias, if any, would be *in favor* of Yellow Cab. Furthermore, to the extent that defense counsel was concerned with the possible presence of animosity toward Wolman, his client's interests could have been adequately protected by a gen-

eral inquiry whether any prospective jurors had any reason not to be fair with Yellow Cab.

In sum, the possibility for prejudice to plaintiffs inherent in the line of questioning dealing with Wolman far outweighed any possible benefit to Yellow Cab, and for this reason it was error to have allowed it.

## II.

Equally unsupportable in this case were the trial court's objected to rulings permitting (a) the introduction into evidence of certain correspondence between one Dr. Mitchell, appellants' principal expert medical witness on the issue of causation, and his malpractice insurance carrier and (b) the use of this same correspondence during cross-examination of Dr. Mitchell.

Appellee Yellow Cab Company seeks to justify its use of this correspondence on the theory that it tended to indicate Dr. Mitchell's awareness that his own professional conduct rather than the automobile accident might have been the cause of the infant plaintiff's injuries and, hence, that Dr. Mitchell had a motive to testify so as to assign blame to Yellow Cab rather than to himself.

This justification fails in two respects. In the first place, this correspondence was utterly irrelevant for the purpose claimed by appellee. Dr. Mitchell was never in any sense threatened with a malpractice suit by appellants, and as his correspondence with his insurance carrier was contractually required by the terms of his policy, it is in no way probative of a guilty state of mind.

Secondly, Dr. Mitchell's correspondence with his insurer was not only irrelevant to Yellow Cab's defense but prejudicial to appellants by suggesting to the jury another possible tortfeasor protected by the vast resources of an insurance company. The opinion in sup-

port of affirmance itself recognizes the unwise public policy of generally permitting evidence of a witness's communication with his insurance company in this day and age when virtually all insurance carriers routinely require advance notification of any possible claims, but this is precisely what that opinion unfortunately portends. Despite the stated intention of the opinion in support of affirmance to limit today's ruling to the particular circumstances at bar, as this case now stands, whenever an individual communicates with his insurance company about a matter in which he may have any involvement, however innocent, that communication opens him to the charge of admitting responsibility for the matter. This eventuality would be most unfortunate.

## III.

As I disagree with the conclusion of the opinion in support of affirmance that appellants are not entitled to a new trial, I find it necessary to discuss the release issue, which, I believe, was also wrongly decided by the trial court.

As a result of the accident involving Yellow Cab's vehicle, two suits were commenced in the Philadelphia Court of Common Pleas. Prior to the infant plaintiff's birth, the first action (C.P. No. 4) was brought by Delores and Martin Price, as husband and wife, for damages to both parties arising from Delores Price's personal injuries. The second action (C.P. No. 5), the case at bar, was brought by the same parties as parents of the infant plaintiff and by the infant plaintiff in her own right*. In the instant C.P. No. 5 action the infant plaintiff sought to recover damages for her own

---

* The two designations C.P. No. 4 and C.P. No. 5 reflect the fact that at the time these two actions were instituted Philadelphia had numerous different courts of common pleas rather than one unified court.

injuries and the parent plaintiffs sought compensation for expenses incurred for medical care and treatment of the infant plaintiff and for loss of the infant plaintiff's earning capacity and services during her minority.

On the eve of the trial, the C.P. No. 4 action for the mother's personal injuries was settled. In connection with the settlement, Delores and Martin Price executed a written instrument generally releasing Yellow Cab from all claims. However, on the copy of the release agreement produced at trial appeared the writing "P.I. 27837, 10/28/60", which was the number of the check paid by Yellow Cab in return for the release. On the face of that check appeared the following language: "For In full and final settlement of all claims arising out of an accident which occurred on March 14, 1959— P.I.—*C.P.* #*4*, March, 1959, #1498." (Emphasis added). And on the reverse side of the check Yellow Cab had printed the language that "This endorsement acknowledges full and complete satisfaction of claims as noted on face of check."

The trial court concluded that since the release instrument was in general terms, the parents could not recover for amounts expended for the medical care of the infant plaintiff. In so doing, it erred in not construing the release agreement together with the check given by Yellow Cab in consideration of the release. Both instruments were inseparably part of the same transaction and should therefore have been considered and construed together. See *Rekas v. Dopkavich,* 362 Pa. 292, 66 A. 2d 230 (1949); Restatement of Contracts §235(c). There is no reason why the doctrine of multiple integrated documents should not include checks. *Getz Bros. & Co. v. Federal Salt Company,* 147 Cal. 115, 81 P. 416 (1905).

Construing the release agreement together with the check given in return for the release, it is clear that

the release pertained only to the action at C.P. No. 4 dealing with the mother's personal injuries and is not a bar to appellants' recovery for expenses incurred in providing medical care and treatment for the infant plaintiff.

For all of the foregoing reasons, I would grant appellants a new trial with medical expenses for the infant plaintiff as a permissible element of damages.

Mr. Justice EAGEN and Mr. Justice O'BRIEN join in this opinion in support of reversal.