Easter *v.* Hancock et al., Appellants.

32

Argued April 15, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Bernard J. McAuley,* and *Wayman, Irvin, Trushel & McAuley,* submitted a brief for appellant, Presbyterian University Hospital, at No. 120.

*Arthur G. Stein,* with him *Daniel B. Winters,* and *Stein and Winters,* for appellant, Thomas E. Hodgins, at No. 127.

*Bernard Markovitz,* with him *Ryan and Bowser,* for appellant, Jon G. Finkler, at No. 128.

*Frederick N. Egler,* with him *Robert J. Pfaff,* and *Egler & Reinstadtler,* for appellant, Reginald A. Hancock, at No. 131.

*Robert S. Daniels,* with him *Harold E. Harper, Robert E. Harper,* and *Alter, Wright & Barron,* for appellee.

OPINION BY JACOBS, J., October 28, 1975:

The action upon which this appeal is based concerns two hemostats left inside the body of plaintiff's decedent during an exploratory operation performed at Presbyterian University Hospital by appellant doctors. On appeal it was contended by three of the appellants that the plaintiff's remarks on the subject of punitive damages resulted in an incorrect and excessive verdict giving grounds for a new trial; two appellants assert that the surgeon in charge of the operation was the only responsible doctor and that his two assistants could not be held liable for the plaintiff's decedent's damages; and one appellant maintains that he was improperly served as a nonresident. We find all these arguments without merit and therefore affirm the judgment of the court below.

The following facts were established in the record of the present case. Elmer Easter was admitted to Presbyterian University Hospital on August 20, 1968, for surgery to correct a disorder of the internal male sex organs. This operation was cancelled, however, when further examination revealed a large mass, which was later determined to be a sarcoma, or malignant tumor, in the patient's pelvic area. Exploratory surgery was performed on August 26, 1968, by Dr. Hancock, assisted by Drs. Hodgins and Finkler, and a nurse employed by the hospital; it was determined that the mass could not be removed. It was understood that the inoperable malignancy would eventually result in the patient's death.

Numerous x-rays were taken of Mr. Easter after his operation until his death 11 months later. Many of the x-rays clearly revealed the presence of two scissor shaped foreign objects in Mr. Easter's left side. These objects proved to be hemostats, or clamps used to control bleeding during an operation, five and three-quarters inches in length and resting in a vertical position, pointed ends directed downward, against Mr. Easter's intestines. Although the presence of the two hemostats was evident

from the x-rays, neither the three appellant doctors nor Drs. Cooper and Ellis, who attended to Mr. Easter after his operation until his death, advised Mr. or Mrs. Easter of the foreign objects left in his abdominal cavity. It was not until March 30, 1969, that a comment by an x-ray technician alerted Mr. Easter to the fact that the hemostats were present. It was decided at that time, however, that the patient's condition could not support further surgery, so no attempt at removal was made. Mr. Easter died on July 8, 1969, as a result of the sarcoma, with the hemostats still in his body.

Mrs. Easter brought suit against all the named defendants alleging negligence in leaving the hemostats in the patient and in failing either to note or disclose their presence. She further alleged that she was entitled to punitive damages due to the alleged conduct of the doctors responsible for Elmer Easter in intentionally not revealing their error to the patient or his family. At the trial, the plaintiff offered a medical expert who testified that, in his opinion, the presence of the hemostats could have caused the patient greater pain and discomfort than the sarcoma and that their removal would have eased Mr. Easter's suffering. The defendant doctors testified that in their opinion the patient's pain was due entirely to the sarcoma and the hemostats contributed nothing to his discomfort. The doctors further explained that their decision to conceal the error from the patient and his family arose not from a desire to protect themselves, but from the well recognized medical practice of keeping from the patient those facts of his condition which in the doctor's opinion might upset him. No excuse was given to explain why the information was not revealed to Mrs. Easter so that she might participate in the decision.

At the conclusion of the plaintiff's case the trial judge ruled that there was no basis on which to award punitive damages, and in his charge carefully emphasized to the jury that the damages they were to decide were to be

compensatory only. The jury returned a verdict of $49,000.00 against the appellants, and a verdict in favor of defendant doctors Ellis and Cooper. Appellants now argue that the verdict was improper and excessive because the jury was influenced by the plaintiff's remarks in his opening statements in which he argued that exemplary damages were indicated to serve as a warning to these doctors and others. They urge us to grant a new trial to correct the trial judge's error in failing to grant a mistrial in light of these remarks.

The case of *Brown v. Central Pa. Traction Co.*, 237 Pa. 324, 85 A. 362 (1912) has been cited in support of appellants' contention that remarks by the plaintiff regarding punitive damages constitute grounds for a mistrial. The court stated therein: "the verdict should be given by way of compensation to the plaintiff and not punishment or warning to the defendant. To urge these latter considerations upon the attention of a jury merely serves to divert their minds from the proper line of thought and counsel indulge in such tactics at their peril."[1] *Id.* at 327, 85 A. at 363. It is further noted that counsel cannot make arguments prejudicial to the opposing party which are not supported by facts in evidence, or which are inflammatory or beyond the limits of fair or sound argument, unduly influencing or distracting the jury. *See, e.g., Girard Trust Corn Exchange Bank v. Philadelphia Transp. Co.*, 410 Pa. 530, 190 A.2d 293 (1963); *Piwoz v. Iannacone*, 406 Pa. 588, 178 A.2d 707 (1962); *Millen v. Miller*, 224 Pa. Superior Ct. 569, 308 A.2d 115 (1973). However, trial counsel must be expected to advance a spirited argument to support his client's cause and promote the interest of justice. As long as no

---

1. This statement of the court in *Brown v. Central Pa. Traction Co.*, 237 Pa. 324, 85 A. 362 (1912) is actually dictum because the appellant failed to raise the question of appellee's prejudicial remarks; the result in that case was to affirm the lower court's decision not to grant a new trial.

liberties are taken with the evidence or prejudices aroused by exaggerated accusations, a lawyer may appeal to a jury in colorful language with the strongest aspect of his case. *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963); *Rondinelli v. Pittsburgh*, 407 Pa. 89, 180 A.2d 74 (1962); *Contractors Lumber & Supply Co. v. Quinette*, 386 Pa. 517, 126 A.2d 442 (1956); *Papa v. Pittsburgh Penn-Center Corp.*, 38 Pa. D & C 2d 756 (Allegheny County, 1965), *aff'd*, 421 Pa. 228, 218 A.2d 783 (1966). The general rule regarding this issue has been stated in *Martin v. Philadelphia Suburban Transp. Co.*, 435 Pa. 391, 394, 257 A.2d 535, 537 (1969), *quoting, McCune v. Leamer*, 383 Pa. 434, 437-38, 119 A.2d 89, 90 (1956): "We have repeatedly held that the matter of withdrawing a juror because of the line of argument pursued by counsel in addressing a jury or at any stage of the proceeding is subject largely to the discretion of the trial court. [citations omitted] Whether a court abuses its discretion in refusing to withdraw a juror because of improper remarks of counsel must be determined by the circumstances under which the statement was made and by the precautions taken by the court and counsel to prevent its having a prejudicial effect."

In the present case, the plaintiff's complaint contained a claim for punitive damages. In his opening statement, plaintiff's counsel was permitted to argue this claim to the jury. Appellants point to several statements made in connection with the claim which they allege are improper and prejudicial: "We have claimed that not only was the negligence in not revealing this to him, but [the doctors'] actions constitute a fraudulent concealment of the facts that the doctors had a duty to reveal this fact to Elmer Easter. . . . They concealed this knowingly from him, and they acted in a manner toward him which we contend was of a gross indifference in their treatment of this patient, and for this we not only are asking ordinary compensatory damages . . . but we are asking for punitive

damages or exemplary damages as you may hear them called, and these are damages which we will say are preventative so that this kind of conduct doesn't happen again by these men and anyone else who would learn of this kind of a situation." The only other reference encouraging an award of punitive damages was the following statement: "It is a case of importance as one which we as citizens must be vigilant to do what we can to see that this does not occur again."

The trial judge ruled at the conclusion of the plaintiff's case that there was no basis on which to allow the punitive damages claim, and the issue was not mentioned again by counsel. In his charge, the lower court carefully instructed the jury that it was not to consider punishing any of the defendants, but was simply to award an amount to compensate the plaintiff against any defendants found liable. The court also instructed the jury that there were two aspects to the plaintiff's assertion of negligence. The first was explained as the original negligence in leaving the hemostats in the body, in which three doctors and the hospital, the present appellants, were involved. The second was the failure to discover or disclose the presence of the foreign objects, in which all the defendants were involved.

Despite the careful instructions of the judge, the jury returned with a question and a verdict slip revealing that they had found two separate amounts against each of the appellants herein. The jury's questions indicated that its members were entirely confused as to damages. The judge then reiterated his instructions on damages, again stating the two aspects of the case, and again stating that there was to be no award made to punish the defendants. The jury then returned with a proper verdict in the same amount as the total of the amounts listed on the faulty verdict form. Appellants now contend that these events indicate that the jury was influenced by plaintiff's statements and was including an amount for punitive damages in the verdict.

We cannot agree with this analysis. It would seem more likely that the jury was attempting, out of confusion, to award a separate amount for each of the two aspects of the case that the judge outlined for them, than that they were awarding an amount for punitive damages when they were specifically instructed not to. This view is borne out by the fact that a lump sum verdict in the same total amount as the original faulty verdict was returned after instructions were given for the second time directing that punitive damages were not to be granted. Furthermore, the plaintiff's remarks in the opening statement, when considered in context as is required, *Martin v. Philadelphia Suburban Transp. Co.,* supra, cannot be considered so inflammatory or prejudicial as to distract the jury and influence the verdict. The plaintiff was correctly arguing punitive damages as part of his pleaded case. When the judge ruled against that issue, counsel did not press it further, and the jury was instructed as to its inapplicability. The closing statements contained no references to it. The trial judge in whose discretion these matters rest and who has the opportunity to view the complexion of the entire trial, was of the opinion that the remarks were without effect. In view of these facts we cannot conclude that the jury was so distracted by this single reference as to lose sight of the real issues of the case.[2]

---

2. The trial judge also felt that the verdict, although substantial, was not excessive in this case, and we agree. The plaintiff's decedent carried two five and three-quarters inch scissor shaped objects in his abdominal cavity from the date of the operation until his death, over ten months later. The jury found that the presence of these hemostats caused him suffering and discomfort for most of the last year of his life. When finally made aware of them, and that their presence had been deliberately concealed from him, the decedent became emotionally distraught, and remained upset over the situation for the rest of his life. In light of this man's needless suffering we see no reason to reduce this verdict or award a new trial to redetermine the damages. *See Purcell v.*

Appellants Finkler and Hodgins also assert that because they were merely assistants aiding and acting under the direction of Hancock, the surgeon who was responsible for performing the operation, they cannot be held liable for leaving the hemostats in the patient's body. We cannot agree. The law was established in Pennsylvania by *Davis v. Kerr,* 239 Pa. 351, 86 A. 1007 (1913) that where a foreign object is left in the body of patient after an operation, a presumption of negligence arises against the doctor who placed it there and failed to remove it. *See Thomas v. Hutchinson,* 442 Pa. 118, 275 A.2d 23 (1971). In the instant case, however, three doctors were involved in the operation: the surgeon Hancock and the two resident doctors assisting him, Finkler and Hodgins. All of them were inserting and removing hemostats during the operation. All three, therefore, were in a position to see that all of the hemostats were removed from the patient's abdomen.

In order to avoid liability the two assistants would have us interpret Pennsylvania's "captain of the ship" doctrine to mean that the responsible surgeon in the operating room is solely liable for any negligent act committed by anyone under his supervision. Such an interpretation would result in the misapplication of that rule. The doctrine, as it has evolved since it was first expressed in *McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243 (1949), establishes the vicarious liability of the surgeon in the operating room to the plaintiff for the negligence of those acting under his direction. Neither *McConnell,* nor any case interpreting or applying its principles, has stated that only the operating surgeon can be liable for the negligence of hospital employees during an operation.

*Westinghouse Broadcasting Co.,* 411 Pa. 167, 191 A.2d 662 (1963) ; *Rondinelli v. Pittsburgh,* 407 Pa. 89, 180 A.2d 74 (1962) ; *Holton v. Gibson,* 402 Pa. 37, 166 A.2d 4 (1960) ; *Papa v. Pittsburgh Penn-Center Corp.,* 38 Pa. D & C 2d 756 (Allegheny County, 1965), *aff'd,* 421 Pa. 228, 218 A.2d 783 (1966).

"*McConnell,* in holding that a doctor in the operating room could be vicariously liable for the negligence of others during the operation, did not hold or say that the operating surgeon, as captain, was the only one who could be held legally responsible for the negligence of other persons in the operating room." *Tonsic v. Wagner,* 458 Pa. 246, 251, 329 A.2d 497, 500 (1974). *See also Conrad v. Lakewood General Hospital,* 67 Wash. 2d 934, 410 P.2d 785 (1966).

Finally, appellant Finkler argues that he was not properly served. It appears from the record that service on this appellant was initially attempted at his address in Pittsburgh but the sheriff's return was marked "not found." He was subsequently served as a nonresident, service being made on the Secretary of the Commonwealth and a copy of the summons and the complaint being sent to Jon Finkler at an Ohio address by certified mail. The return receipt was signed "Jon Finkler" and impressed with a postmark reading "Sacramento, California." Appellant Finkler did not appear at the trial and judgment was entered against him in the amount of the verdict. He then petitioned the court to permit him to file a motion for a new trial nunc pro tunc. His petition was allowed and he filed motions for a new trial and for judgment n.o.v. Appellant now complains that the service on him as a nonresident was improper because he was engaged in military service and stationed in California during the period service was attempted but did not terminate his residency in Pennsylvania. It is therefore alleged that he should have been served as a resident.

Appellant Finkler was served under the Act of July 1, 1970, P.L. 444, No. 152, §§1-6, 12 P.S. §§341-46 (Supp. 1975-76), *repealed,* Act of November 15, 1972, P.L. 1063, No. 271, §5,[3] which provides for the service of

---

3. The Act of July 1, 1970, P.L. 444, No. 152, §§1-6 was replaced by the Act of November 15, 1972, P.L. 1063, No. 271,

tortfeasors who are nonresidents, or are residents who become nonresidents, by allowing service to be made on the Secretary of the Commonwealth as agent for the defendant. The question we must decide in order to determine if this constituted proper service of process is whether appellant Finkler's temporary absence from the Commonwealth for a two year tour of duty with the armed services rendered him a nonresident under the terms of the Act. In *Rich v. Jefferson Medical College,* 125 F. Supp. 357 (E. D. Pa. 1954), it was held that a defendant doctor in a malpractice suit who was transferred out of the Commonwealth on military duty was a nonresident for the purpose of tolling the statute of limitations. The district court quoted from *Hunter v. Bremer,* 256 Pa. 257, 264, 100 A. 809, 812 (1917) wherein the meaning of residency under the tolling statute was discussed as "[contemplating] simply a residence of such permanency that the person in question may be found here and served with ordinary legal process at any time, generally speaking. The existence of such a residence constitutes one a resident within the meaning of the act, and, on the other hand, its absence makes him a nonresident." *Rich v. Jefferson Medical College,* supra, at 359.

It would seem that the circumstance of attending to military duty in another jurisdiction would render an individual a nonresident for purposes of service under the Act of July 1, 1970, if it is sufficient to toll the statute

---

§§8301-11, 42 P.S. §§8301-11 (Supp. 1975-76). Service can be accomplished under the Act of July 1, 1970, even when the tortious conduct was committed prior to the effective date of that Act. *Sussman v. Yaffee,* 443 Pa. 12, 275 A.2d 364 (1971). We note further that appellant's arguments based on Pa.R.C.P. 2077, 2079 and 2082, concerning service on nonresidents, are to no avail since those rules are not applicable to the present case. *See McCully-Smith Associates, Inc. v. Armour & Co.,* 349 F. Supp. 694 (W.D.Pa. 1972).

of limitations. If a named defendant is not subject to "ordinary legal process" in Pennsylvania due to his absence from the Commonwealth, permanent or temporary, the process outlined by the Act of July 1, 1970 is a proper method for the plaintiff to reach him.[4] Furthermore, appellant Finkler's contention that the service did not give him adequate notice of the suit is without merit. It has been held that long-arm service on nonresidents who commit tortious acts within the jurisdiction attempting service does not violate due process. *McGee v. International Life Ins. Co.*, 355 U.S. 220 (1957). "In the face of the constitutionality of the statute, and the compliance with its procedures by the plaintiff, the fact that [the appellant] never actually received the complaint and the summons is of no consequence." *McCully-Smith Associates, Inc. v. Armour & Co.*, 358 F. Supp. 331, 333 (W.D.Pa. 1973).

Judgment affirmed.

———

DISSENTING OPINION BY VAN DER VOORT, J.:

I respectfully dissent from that part of the Opinion of the Majority which declines to grant a new trial as to damages. The facts are fully set forth in the Majority Opinion. In summary, the plaintiff's decedent, the late Elmer Easter, age 67, was operated upon on August 26, 1968 for a large abdominal cancer which was found to be so extensive that removal was inadvisable. In the course of the operation, 150 hemostats were used to stop the bleeding. After the operation he received radiation treatments and chemotherapy. During the course of the

———

4. The court in *Rich v. Jefferson Medical College*, 125 F. Supp. 357 (E. D. Pa. 1954) noted that the possibility that the defendant doctor was subject to service at his place of domicile in Pennsylvania, or could be served on a reissued Writ of Summons upon his return from the military service was of no consequence in determining the meaning of the term nonresident.

treatments it was discovered that two hemostats had been left in Mr. Easter's body. Mr. Easter was not informed of their presence because, the doctors said, it would be unnecessarily upsetting to the patient and the risk of removal would be too great to attempt it. Mr. Easter however was told of the presence of the hemostats in March of 1969. He died of cancer in July of that year. His widow brought suit for damages for the negligent leaving of the hemostats in her deceased husband's body.

I agree with the Majority that Doctors Hancock, Finkler, Hodgins and the Presbyterian University Hospital were properly held liable for damages to the late Elmer Easter's estate. However, I do not agree that a fair trial was held in determining the amount of these damages. Before trial, in a conference in the Judge's chambers, counsel for the defendants-appellants objected to a discussion of punitive damages. The trial Judge properly ruled as follows with respect to the plaintiff's opening address to the Jury saying, "Of course, he takes the risk as all lawyers do when they open to the Jury, if they say something which is particularly inflammatory and extremely prejudicial in the absence of proof supporting it, that you may then at a proper time move for a mistrial." The case proceeded to trial and the plaintiff made the following opening statements to the Jury: "We have claimed that not only was the negligence in not revealing this to him, but their actions constitute a fraudulent concealment of the facts that the doctors had a duty to reveal this fact to Elmer Easter and let him make up his mind as to whether or not they should be removed, let him make up his mind as to what the course of the next ten months of his life were to be. But no, they concealed this from him. They concealed this knowingly from him, and they acted in a manner toward him which we contend was of a gross indifference in their treatment of this patient, and for this we not only are asking ordinary compensatory damages, damages that you will determine for the pain and suffering that

he has gone through, but we are asking for punitive damages or exemplary damages as you may hear them called, and these are damages which we will say are preventative so that this kind of conduct doesn't happen again by these men and anyone else who would learn of this kind of a situation." And, he further stated to the Jury as follows: "It is a case of importance as one which we as citizens must be vigilant to do what we can to see that this does not occur again."

I believe that these remarks of counsel were inflammatory and uncalled for. At the inception of the trial, counsel created an atmosphere of prejudice against the appellants. It turned out that the plaintiff had no evidence to support punitive or exemplary damages. However, appellee's counsel had already indicated to the Jury that they should punish the doctors and the hospital. Medical Doctors are in a profession in which they must hurt many of their patients in order to try to cure them. Much of this is done in hospitals. Consequently, doctors and hospitals are "target" defendants. Prejudicial language should not be used in any trial; however, prejudice is more easily generated in a trial involving doctors and hospitals because the sensitive nature of their work makes them especially vulnerable to resentment.

The Jury in this case was confused as to damages. Their confusion persisted to the very end of the trial. This is demonstrated by the lengthy colloquy[1] between

---

1. (JURY PRESENT IN THE COURTROOM) (SIDEBAR DISCUSSION.)

"THE COURT: You are Mrs. Frosh. Down at the bottom of the verdict slip you have Doctor Hancock, Doctor Finkler, Doctor Hodgins, and Presbyterian a thousand dollars a piece. What do mean (sic) by that?

MRS. FROSH: The damages that we set.

THE COURT: That that was what they are to pay?

MRS. FROSH: What we understood, that is why we sent the note down. That is what we understood we were to set an amount of what we thought.

the trial Judge and the foreman of the Jury after the Jury returned with its first verdict which was an incorrect one, and it was necessary for the Judge to require the Jury to retire and reconsider its verdict.

For these reasons, I would grant a new trial as to damages only in this case.

PRICE, J., joins in this dissenting opinion.

THE COURT: How do you reconcile where you say liability charges, Doctor Hancock ten thousand dollars as compared with Doctor Hancock one thousand dollars?

MRS. FROSH: Well this we figured—

THE COURT: The cause of action—

MRS. FROSH: We felt that the damages didn't warrant a high monetary settlement.

THE COURT: What do you construe to be the total amount on here that you are awarding to the plaintiff? What would you say the total amount is that you were awarding?

MRS. FROSH: I would say Fifty Thousand dollars. It is forty-nine thousand dollars.

THE COURT: Do I understand that this down here, this is on the second cause of action on what you call failure to disclose cause of action. There was a cause of action for the fact that the hemostats were in there, is that what is up here?

MRS. FROSH: That would be here.

THE COURT: And this is the so-called figure (sic) to disclose?

MRS. FROSH: This we took to mean the pain that he had suffered, his pain, distress and all that that Mr. Easter suffered, and we figured this would compensate for that.

THE COURT: How much do you expect Mrs. Easter to get?

MRS. FROSH: Does she get all of this?

THE COURT: What do you expect her to get?

MRS. FROSH: I don't understand the question.

THE COURT: What amount of money is the thought of the jury that Mrs. Easter as executrix of the estate should receive, what total amount of money are you saying that she should receive?

MRS. FROSH: If you add all the amounts up it would be forty-nine thousand dollars.

THE COURT: Is it the thought of the jury that Mrs. Easter as executrix should get forty-nine thousand dollars?

MRS. FROSH: Yes. That is why we sent the question down as to we thought you would set a figure you know between here and

CONCURRING and DISSENTING OPINION BY SPAETH, J.:

I agree with Judge JACOBS's opinion so far as it rejects the argument by appellants Finkler and Hodgins, that as mere assistants they could not be held liable, and the argument by appellant Finkler, that he was not properly served; I cannot agree, however, that the jury was not distracted by the issue of punitive damages.

Judge VAN der VOORT in his dissenting opinion has quoted the colloquy between the trial judge and the jury regarding the first set of verdicts. To me, the colloquy shows that despite the judge's best efforts, the jury did intend to punish appellants and not simply to award compensation. At the beginning of the colloquy, the forelady said, "We felt that the damages didn't warrant a high monetary settlement." That this was the case was precisely appellants' contention. However, when the judge then pressed her as to why the jury had nevertheless awarded a high settlement, she replied: "We thought the case as far as the doctors being negligent and irresponsible, I will use the word was greater than what Mr. Easter had suffered. That is why we did it." I cannot read this as meaning anything except that the jury had

---

there because we were at a loss to know what kind of figure it really would come to. We thought that the case as far as the doctors being negligent and irresponsible, I will use the word was greater than what Mr. Easter had suffered. That is the way we did it.

THE COURT: Do you mean that you were putting it in the sense of punitive damages, that you feel they should be punished?

MRS. FROSH: After we came to the liability charges that they were liable, who was liable and not liable, then we had to come—

THE COURT: What amount of money did you decide?

MRS. FROSH: You mean a total?

THE COURT: What amount of money did you decide was a proper sum for the pain and suffering of Mr. Easter produced by the hemostats as opposed to his other condition?

MRS. FROSH: Just this small amount down here. (The 'small amount down here' was $4,000.00)."

48

awarded punitive damages, despite the judge's instruction not to. Furthermore, it is apparent that the judge understood the reply in the same way, for upon hearing it, he asked, "Do you mean that you were putting it in the sense of punitive damages, that you feel they should be punished?" Unfortunately, he did not get an answer to his question.

In ruling on the post-trial motions, the court below recognized the significance of this conversation between the trial judge and the forelady: "But in the present case we have an abortive verdict slip and the collogue [*sic*] . . . from which it can be reasonably argued that the final verdict was only slightly for proper legal compensation and overwhelmingly on account of the extraordinary nature of the tort." The court below felt nonetheless, that the confusion of the jury was remedied by the trial judge's reinstruction of the jury that punitive damages could not be awarded. (R. 769a.) Since, however, it can be "reasonably argued" that the jury was confused, as the court below recognizes, it would be the better course  of action, in my judgment, to award a new trial.

It is true that the jury "corrected" its verdicts, and Judge JACOBS may be right that from this "[i]t would seem more likely that the jury was attempting [to obey the judge's instructions]." However, I am uneasy with such a more likely than not test. Given all the circumstances, I remain fearful that the jury was not fair, or at least, remained confused.

I would award a new trial.