# Purcell v. Westinghouse Broadcasting Co., Appellant.

168

Argued April 29, 1963.  Before BELL, C.J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*George E. Beechwood,* with him *John V. Lovitt,* and *Beechwood and Lovitt,* for appellant.

*I. Raymond Kremer,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 5, 1963:

Austin Purcell, the plaintiff in this case, sued the Westinghouse Broadcasting Company, owner of radio station KYW in Philadelphia, for slander and libel, averring in his complaint that the defendant on March 20, 1955, through the facilities of KYW, "recklessly; falsely, wickedly, maliciously and illegally broadcast" a program entitled "Tow a Crooked Mile, which broadcast was false, scandalous, malicious, defamatory, libelous and slanderous," in that it accused the plaintiff of participating in law violations and schemes to defraud the public.

The defendant filed an answer making certain denials and setting forth under the heading of new matter that the program was "substantially true," that it "constituted fair comment upon a subject of public interest", that it was privileged and that the words and substance of the program were uttered without malice.

At the trial which lasted eight days, the jury returned a verdict in favor of the plaintiff in the sum of $10,000 compensatory damages and $50,000 punitive damages. The defendant appealed, asking for judgment n.o.v., and, in the alternative, a new trial.

The salient facts follow. For some time prior to 1953 there reportedly flourished in Philadelphia what was known as a "towing car racket." When automobile accidents occurred, there often appeared on the scene a person who offered to tow the disabled car or cars off the streets. When the owner or owners later applied for their cars, they were handed alleged exorbitant bills for towing and repairs (which assertedly sometimes were not made) and which they were compelled to pay in order to repossess their vehicles.

In 1953, the City Council of Philadelphia enacted an ordinance aimed at combating the described extortionate practice. Under this ordinance (1953 Ordinances, Page 278, Philadelphia Code, §9-605, persons engaged in the towing business were required to take out a license and publish the prices they intended to charge for their services. Certain forms were prescribed for the business, and contracts for repairs had to be made specially.

On February 24, 1955, five persons who had been arrested and charged with violating this towing ordinance, came before Magistrate Elias Myers in Philadelphia. After an extended hearing at which only prosecution witnesses testified, the defendants were convicted under varying charges and sentenced. Since, in this appeal, we are only concerned with the fate of Austin Purcell, no further reference will be made to Purcell's fellow-defendants.

As to Austin Purcell, the magistrate pronounced his judgment as follows: "Austin Purcell, you should have been held for $3,500 in fines, instead of which we will make it $500 also, and one costs. $1,000 Bail for

Court." Purcell was held for grand jury action. Purcell appealed his summary conviction on March 4, 1955, and on September 16, 1955, the appeal was sustained and the record of conviction stricken from the record.

At the April 1955 session of the grand jury, he was indicted for conspiring to violate the provisions of the towing ordinance and at the June Sessions 1955, he was indicted for failure to register under the Fictitious Name Act. On January 17, 1956, the Commonwealth moved to nol pros both indictments and the court of quarter sessions granted the motion.

Thus, Austin Purcell was wholly exonerated of all charges of violating the law. In the meantime, however, on March 20, 1955, through the medium of the KYW radio station, Purcell's honesty was attacked, his integrity impugned and his standing as a law-abiding citizen severely maligned.

The defendant contends that at the time of the broadcast, the sponge of appeal had not wiped clean the slate of Austin Purcell and that therefore it was justified in applying to him the epithets which will later be more extensively discussed. In the presentation of his case against the defendant in common pleas court for slander and libel, Purcell introduced the stenographic record of the magistrate's hearing of February 20, 1955. That record covers 113 pages of the printed record. He also introduced as an exhibit the audio tape of the broadcast of March 20, 1955. It was played before the court and jury. In the printed record in our court it covers 18 pages.

The defendant maintains that whatever appears in the radio transcript is justified by what was said at the magistrate's hearing. A comparison between the magistrate's record and the radio transcript can, from the viewpoint of the defendant, only be regarded as lamentable.

The hearing in the magistrate's court was the usual type of proceeding one encounters in the minor tribunals, hardly material for a full-blown dramatic radio or television program. This prosaic, dull, repetitive material, however, in the skillful hands of script writers and arrangers became transformed into an exciting show over the radio with villains, heroes—and innocent victims, one of them being the plaintiff in this case.

Had no real names been mentioned or existing persons not identified in it, the radio show would have been diverting but innocuous. But it was not presented as fiction; it was advertised and precisely labeled as a news documentary. Documentary proof is regarded as one of the highest types of reliable evidence. The radio station, therefore, prior to describing its program as documentary, was charged by the most elementary principles of propriety, to factually substantiate what it was to say, if that saying would tend to blacken the name of the person it singled out as a malfeasant. A man's good name is as much his possession as his physical property. It is more than property, it is his guardian angel of safety and security; it is his lifesaver in the sea of adversity, it is his parachute when he falls out of the sky of good fortune, it is his plank of rescue in the quicksands of personal disaster.

The defendant treated the plaintiff's name with reckless unconcern, culpable indifference and palpable irresponsibility. It made no effort to protect him from a possible injustice by making appropriate inquiry before castigating him publicly. Nor can it say that it was ignorant of the plaintiff's true status in the matter which was the subject of the broadcast. The defendant's own representative, Paul Taylor, of the KYW News staff, covered the magistrate's hearing and thus had direct, personal knowledge of what transpired there. Later he became the principal performer on the radio show.

174

In the broadcast, Taylor spoke in the first person. He told how he had originally been impressed and disturbed by a complaint someone had made to him about a "gouging he had received from a guy who had towed his car away." Taylor related how he decided to do something about the situation and how he went to the district attorney, armed with a portable tape recorder. He then, on the radio show, played back the district attorney's statement in which the district attorney spoke of the "very tough mugs who run this towing car racket," and of how automobilists were being "gypped." Taylor narrated his conversations with two detectives (Hansen and Rosenberg) assigned to the "towing car racket," and, through his tape recorder, projected the utterances of these men, one of whom spoke of "many people" who "had been bilked by this so-called G. & M." Purcell had at one time worked as shop foreman at the G. & M. Rosenberg said that many victims of the towing racket did not want to prosecute because "they were fearful of reprisals."

Following this, Taylor broadcast anonymous voices, a couple of men and a woman, who related how they had been "bilked" by the towing racketeers. Rosenberg once again spoke out from the tape recorder, telling how many persons told them they had been "roped" by "G" men or "Windrim." The narrator now broke in to tell the public of Paul Taylor's excellent investigation and the good work of the district attorney's office, and then he histrionically announced: "Now the pot was ready to boil."

At this point Taylor described the hearing in Magistrate Myers' court, specifying: "I was at that hearing held in magistrate's court on February 24, 1955. The witnesses you heard earlier on this program and others were called to give their testimony."

The impression was here conveyed that the statements made by the anonymous voices into Taylor's

tape recorder were exactly the same statements made at the magistrate's hearing, which they were not. Taylor summed up the whole matter by relating that Purcell had been fined $500 and that he was held in $1000 bail for action by the grand jury on "other counts."

He did not stop here. He went on to say that "There are, unfortunately, dishonest persons in any line of endeavor," and, that "the sentencing of a few racketeers is not enough." He then inserted into the broadcast an utterance he had gotten from the district attorney and thus projected the illusion that the district attorney was directly commenting on the Purcell conviction. The words of the district attorney were: "In any lucrative racket you will always find some thugs getting into." He deplored that motorists who are in accidents are "very frequently quite terrified of the kind of mugs who sign them up" and that his office will see to it that justice is done to the "gentlemen who gypped them."

Thus, through this manipulation of the audio tape and the employment of anonymous voices, the public was made to believe that Purcell was a "mug," a "thug," a "racketeer", one who "gypped" others, and one who "terrified" his victims who were afraid of "reprisals."

Taylor, who knew the realities, did not acquaint the public with the fact that Purcell announced, after the magistrate's action, that he would file an appeal and that this appeal was indeed officially filed long before the broadcast. Taylor said nothing to even suggest, which he of course had to know, that the magistrate's proceeding was only a preliminary hearing and that, therefore, Purcell's side of the story was not heard. All the derogatory phrases and attacks on character employed in the broadcast were funneled by Taylor into a blunderbuss which was fired pointblank at Purcell, although the accusatory voices had not accused Purcell of illegally towing away cars.

Even with this drastically curtailed summary of a 955-page record, it is quite evident that the blunderbuss volley exposed Purcell to "ridicule, contempt, hatred or degradation of character," the classic revelatory phrase in the law of libel.[1]

As already stated, Purcell sued the Westinghouse Broadcasting Company for slander and libel, the common law distinctions between these two terms not being applicable to the law of radio. (*Summit Hotel Co. v. N. Broadcasting Co.*, 336 Pa. 182.) At the trial Purcell denied the veracity of the characterizations aimed at him in the KYW broadcast. He testified specifically that he had never been engaged in the "towing car racket," that he had never towed cars, that he had not at any time paid a fine for violating the towing car ordinance, he had never been a racketeer, or part of a "web of racketeers," that he had never been a thug or a "mug," that he was honest, that he had never victimized anybody or terrified anyone or threatened reprisal against anyone. He testified also that detectives Hansen and Rosenberg never questioned him, nor did KYW direct any inquiries to him prior to the broadcast.

The plaintiff made out a prima facie case of defamation, and no adequate defense was proved by the defendant. The Act of August 21, 1953, P. L. 1291, §1, 12 P.S. §1584a, provides: "In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised: a. The defamatory character of the communication; b. Its publication by the defendant; c. Its application to the plaintiff; d. The recipient's understanding of its defamatory meaning; e. The recipient's understanding of it as intended to be applied to the plaintiff; f. Special harm resulting to the plaintiff from its publication; g. Abuse of a conditionally privileged occasion."

---

[1] *Pittock v. O'Niell*, 63 Pa. 253, 258.

Since the record shows that the plaintiff met all the requirements above enumerated, it became the defendant's burden to prove, under the Act: "a. The truth of the defamatory communication; b. The privileged character of the occasion on which it was published; c. The character of the subject matter of defamatory comment as of public concern."

The defendant was wholly unable to prove the truth of the defamatory statements but it submits that, regardless of that feature of the case, it was free from liability because it enjoys the privilege defined in Section 611, Restatement, Torts, namely, "The publication of a report of judicial proceedings . . . is privileged, although it contains matter which is false and defamatory, if it is (a) accurate and complete or a fair abridgement of such proceedings; and (b) not made solely for the purpose of causing harm to the person defamed."

However, as has been shown, the report presented by the defendant of the "judicial proceedings" was not accurate and complete nor was it a fair abridgement of the proceedings. We have seen that a considerable part of the broadcast was made up from statements in no way connected with the judicial proceedings; we have noted how those statements were interwoven into the "report" of the judicial proceedings so as to give a wholly distorted picture of what occurred in Magistrate Myers' court.

The defendant cites in support of its position our recent decision of *Sciandra v. Lynett*, 409 Pa. 595, where this Court held that a report published in a newspaper of the meeting which took place in the highly publicized notorious gathering at Apalachin, New York, in 1957 did not constitute a libel on one of the participants at that conference, even though an erroneous detail had appeared in the report. The facts in that litigation can not be similarized to the facts before us

in the case at bar. In *Sciandra* the newspaper published in a somewhat abbreviated form the report made by the Governor of New York on the subject therein contained. There was no attempt on the part of the newspaper to build up a case against any particular person. It did not introduce extraneous matter; it adhered to the Governor's report. Here the defendant's broadcast was made up mostly from what occurred *outside* the judicial proceedings. Of the 18 pages printed in the record, less than three pages were devoted to the "judicial proceedings."

Instead of supporting the defendant's position, the *Sciandra* case really condemns it. Justice EAGEN, writing for our Court, said: "This qualified immunity is forfeited if the publisher steps out of the scope of the privilege or abuses the 'occasion.' This can be done by exaggerated additions, or embellishments to the account."

This is exactly what the defendant did here. Its broadcast contained "exaggerated additions," and it brought in "embellishments to the account." In *Luckock v. Daily News Pub. Co.,* 74 Pa. Superior Ct. 429, the Superior Court pertinently said: "It is no new doctrine that even a privileged article may be so published, the account of it may be so highly colored and accompanied with such offensive comments and observations, that the privilege, which would have inhered in a fair publication, is lost."

There can be no doubt that the defendant here could have done an excellent public service by telling its audience truthfully what it had discovered in its investigation of the alleged "towing car racket" and then subjoining an accurate statement of what occurred at Magistrate Myers' hearing. The fault lay in breaking the egg of the extra-judicial "investigation" and the egg of the judicial hearing into one omelet and seasoning it with comment and observations which made the

parentage of either original egg impossible of ascertainment as to taste, color, shape or form.

The highlighting of Purcell in the broadcast could not be attributed to his being a person of public importance or even one at all known to the general public. In the vast panorama of the population of the metropolitan city of Philadelphia he was only a blur in the picture. This blur KYW proceeded to enlarge under the magnifying glass of exaggeration, it was then sharpened with the pencil and keen knife of purpose, colored to meet the design of the defendant, until what was a gray, meaningless dot of anonymity became the portrait of an enemy of society, a "mug," a "racketeer", a criminal. If this can be done with impunity, no one can be assured of immunity from defamation, no matter how pure his life or honest his intentions.

The defendant argues that there is nothing in the case which shows that it entertained any malice toward Purcell, but where libel is involved, malice is not necessarily synonymous with malignance of temper, vengefulness of spirit, or personal prejudice, attributes which usually go with "malice" in non-legal parlance. Legal malice can generate from a reckless and wanton disregard of another's rights. It may arise from a "want of reasonable care and diligence to ascertain the truth, before giving currency to an untrue communication." The failure to employ such "reasonable care and diligence" can destroy a privilege which otherwise would protect the utterer of the communication. (*Montgomery v. Dennison,* 363 Pa. 255.)

What was said in *Wallace v. Jameson,* 179 Pa. 98, 116, could well apply here: "The publication complained of was more than a narration of even alleged facts. It was a highly sensational and damaging account of an alleged illegal transaction, with mention and reference to the plaintiff as being connected with and party there-

to. It brought the case directly within the rulings in regard to the style of the publication. Thus in Pittock v. O'Neill, 63 Pa. 253, it was said, 'had the publication been confined to the petition filed in the court of common pleas it might have been considered as privileged, and the plaintiff held bound to prove express malice. But the comments which accompanied it deprived it of its privilege. It has been held to be libelous to publish a highly colored account of judicial proceedings mixed with the party's own observations and conclusions.' In Neeb v. Hope, 111 Pa. 145, it was said, 'The defendants contend that if the publication was made in good faith and without malice they are not liable. This would be so had the article kept within proper limits.' And in Conroy v. Pittsburg Times, 139 Pa. 334, it was held that a privileged communication is one made upon a proper occasion, from a proper motive, based upon reasonable or probable cause, and in a proper manner. 'If the manner be improper the privilege is lost.' "

The defendant strenuously argues that there could have been no exercise of malice against Purcell because, it points out, neither Taylor nor anyone connected with KYW knew Purcell. But the man who recklessly throws a chair out of a fifth story window does not need to know the person whom the chair eventually hits, in order to be held liable for the damage done to him. Similarly, if one hurls defamatory epithets in a manner to strike one to whom they seem, because of fortuitous circumstances, peculiarly to fit, he is liable as much as if he had aimed his remarks precisely at that person. In *Clark v. North American Co.*, 203 Pa. 346, 351, we said: "What the article meant or intended was only one of the grounds on which defendant's liability might rest. The manner in which it was expressed might so point to plaintiff as equally to constitute a libel upon him without any actual intention to refer to him at all. Even in reporting an occurrence

proper for publication there may be such an absence of the required diligence and care to ascertain the truth as to make the report libelous . . . The mode of presenting the case to the jury made it turn on the intent, and ignored entirely the liability arising from negligent disregard of the injury that might be inflicted upon the plaintiff. If this were the law few persons could ever have legal redress for libels in newspapers, for it is very seldom that any personal malice or intent to injure is the purpose of the publication."

. The privilege which KYW enjoyed to report on what was legitimately news vanished completely when it distorted the news so as to do damage to an innocent person. The manner in which the defendant spliced together disconnected statements and circumstances so as to make the whole appear a continuous occurrence, all to the hurt of the plaintiff, spelled out the legal malice which is required in order to hold a news-dispensing instrumentality liable for defamation of character.

The defendant assumes that because its representative called upon the district attorney and discussed the alleged investigation with him, this visit in some way cloaked the defendant with immunity in all its comments upon those whose names could, by inference, suspicion or sheer wilfulness, be drawn into the orbit of discussion on the towing car racket. The district attorney spoke generally, the defendant accused specifically. The remarks of the district attorney were a fire hose aimed at fighting a general fire. The defendant turned the high powered hose on an unoffending bystander, stripping him of his suit of respectability woven on the loom of a life of good citizenship.

The defendant makes the startling statement in its brief that "even if defendant had known plaintiff was innocent and not a racketeer the broadcast would still be privileged." This argues that because one is en-

gaged in the business of news-dispensing, he may circulate a statement which he knows to be utterly false, to the irreparable injury of the innocent person. This would make legal tender of falsehood, give dignity to mendacity and make character assassination respectable. There is nothing in the laws of our country, and certainly not in the precepts of this nation which would give approval to so utterly immoral a standard of conduct. As the distinguished Justice PAXSON cogently stated it in the case of *Briggs v. Garrett,* 111 Pa. 404, 414: "A lie is never privileged. It always has malice coiled up within it. When a man coins and utters a lie, or when he repeats it knowing it to be false, the law implies malice and he cannot shelter himself behind the doctrine of privileged communications."

The defendant attempts to support its thesis in this phase of its argument by referring to Comment a to §611 of Restatement, Torts, namely, "This privilege differs from the usual conditional privilege in that it affords protection even though the defamatory statement reported is known to be false."

But §611, as we have already shown, refers to the publication of a judicial proceeding in an "accurate and complete" manner or in a "fair abridgement of the proceedings." It is obvious of course, as we have already demonstrated, that the defendant did not do this.

The defendant submits that the judgment entered in the court below amounts to an abridgement of the freedom of the press. There is nothing in the record to clothe this bare assertion with the garment of fact. As Chief Justice BELL pointed out in *Bogash v. Elkins,* 405 Pa. 437, 439: "Freedom of speech is one of the most prized rights of every American but it is not absolute. '. . . every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty:' Article I, Section 7 of the Constitution of Pennsylvania."

Both the court below and the jury found in this litigation that the defendant had abused the liberty of freedom of speech. There is no reason to disturb that finding. The refusal of the court below to enter judgment n.o.v. is affirmed.

The defendant seeks a new trial submitting various propositions in this regard. It argues that the court committed error in admitting the transcript of the hearing before Magistrate Myers, together with evidence of Purcell's appeal from the summary conviction, his later exoneration, and the nol prossing of the indictments returned against him. The defendant says that the fact the defendant was acquitted after the broadcast has no bearing on the status of the event at the time of the broadcast. To a certain extent this is true. However, it was necessary for the plaintiff, in making out his case, to show that he did not accept the adjudication of the magistrate and that he duly appealed. This protest to an appellate tribunal was a vitally important item in the whole caravan of events. It was completely ignored by the defendant in its broadcast, although its representative had direct knowledge, through physical presence at the time and place, of the announcement of the appeal.

If the evidence adduced at the magistrate's hearing against Purcell had been of a convincing character and had clearly revealed him as a participant in the towing car racket, and no appeal had been taken, all subsequent proceedings might well have been irrelevant. But to hypothesize on a situation which was contrary to reality is simply an exercise in imaginative logic. The stark unbudgeable fact remains that Purcell did appeal and that appeal stayed all punitive proceedings. It did more than that, it nullified for the period of appellate pendency the effect of everything which had been presented by the Commonwealth, so that Purcell stood before the world as unoffending as one who had never been accused.

In addition to this, it must be noted that the prosecution's evidence at the magistrate's hearing was very weak. Thus the jury was entitled to know that, even after the passage of an appreciable period, when the Commonwealth might have obtained further evidence if it existed, the case against Purcell was still untenable. All of this shed light on the very important question as to whether the defendant was justified in depicting Purcell before the public as a dishonest person and law violator. The jury needed this evidence in order to determine whether the defendant was guilty of the legal malice which had to be established in order to fasten liability on the defendant, considering the fact that it enjoyed a qualified privilege in the dispensing of news.

The defendant then complains, in pressing its motion for a new trial, that the plaintiff's counsel, in his summation to the jury, employed inflammatory language and that it was entitled to have a juror withdrawn on that account. We have had occasion only recently to consider complaints of a similar character. (*Contractors L. & S. Co. v. Quinette*, 386 Pa. 517; *Rondinelli v. Pittsburgh*, 407 Pa. 89.) We have said that whether a lawyer's speech transgresses the bounds of legitimate argument in a lawsuit is primarily a matter for the trial judge to decide because he is present and can note not only the structure of the argument but the manner in which it is projected to the jury.

If the defendant, by its derogatory broadcast, tore to shreds the plaintiff's reputation as a law-abiding citizen, as the plaintiff contended; if the defendant moved with malice against a person who was wholly unoffending, holding him up to the scorn and the opprobrium of his friends, neighbors, acquaintances and strangers too, this was a fault which could not be lightly condoned, and the last person to make such condonation would be the injured man's lawyer and his champi-

on for justice in court. If the lawyer became indignant, if he used voice modulations and gestures, and exhorted with spirited language the jury to return a verdict for his client for a sum of money commensurate with the loss he had sustained, that is all part of our adversary system of trial.

The age of today is a machine age, but the mechanization of man's efforts has not yet reached the point where emotions must be completely stifled and their expression in appropriate language curbed, even in a courtroom, provided always, of course, that the lawyer acts with decorum, does not misquote testimony, does not take liberties with the evidence and does not unfairly ill treat witnesses or opposing counsel. The trial court held that the argument of the plaintiff's counsel was within these bounds and that it "appropriately reviewed the evidence." The court also pointed out that it admonished the jury not to be swayed by passion, prejudice, sentiment or fancy, and that it "must be reasonable and exercise a reasonable discretion."

In view of all this, we are satisfied that the court did not abuse its discretion in refusing to withdraw a juror because of plaintiff's counsel's summation.

After the verdict was rendered, the defendant moved in the court below for a remittitur on the basis that the verdict was excessive and that the charge "was incorrect and erroneous in every respect with respect to the law as to general damages and as to punitive damages." We have examined the learned court's charge and find no error in it, nor has the defendant established any such error. We are satisfied that the court properly refused any remittitur as to compensatory damages. We are also satisfied that the plaintiff proved his asserted right to punitive damages. The plaintiff's wife testified that on the day the defendant's radio program was to be broadcast she saw an advertisement in the newspapers to this effect and she tele-

phoned the program director of KYW to protest. She testified that she told the program director, inter alia: "Would you please hold off broadcasting this program until the charges against my husband are either proven or disproven . . . An appeal has been filed, and I think that you should at least wait until this man has an opportunity to prove his innocence."

The program director informed her that the program was scheduled and they had no notion of taking it off the air. The verdict of the jury would indicate that the jury was impressed with this effort on the part of the plaintiff's wife to prevent the defamation of her husband's character by the defendant and regarded the defendant's refusal to cancel or postpone the broadcast as a mark of malice.

In the case of *Clark v. North American Co.*, supra, 203 Pa. 346, 354, involving libel, the plaintiff had requested unsuccessfully the defendant newspaper to publish a retraction. The trial judge excluded from the jury the question of punitive damages. This Court reversed and said, through Justice MITCHELL: "There was evidence in the case on which the jury might have found punitive damages, and it was error to take that matter away from them. The refusal or neglect to publish a retraction as to plaintiff after he had called defendant's attention to the injustice done him was in itself sufficient, and in this connection the tone and wording of the article itself as indicative of a desire to make a sensation, or to hit at parties higher in station over plaintiff's head regardless of the effect on him, were open for the consideration of the jury."

The case at bar is even stronger than the *Clark* case because here the request not to defame was made before the publication of the libel.

The trial court here, obviously taking its cue from several decisions of this Court on the subject, properly charged the jury on punitive damages as follows: "The

next item claimed by the plaintiff is the element of punitive or exemplary damages. This type of award may properly be given only if you conclude that there was actual malice in the broadcast. It is a class of damages which may be awarded in proper circumstances by way of a penalty to the defendant, and to act as . . . both a punishment and a means of deterring others who may be like-minded. Exemplary or punitive damages bear no relation to the question of reputation as in the case of general damages, but depend rather upon the jury's view as to what sum should be assessed against the defendant to punish him for his dereliction and malice, and to deter others from doing the same thing. There is no definite yardstick."

In further protection of the defendant's rights, the court charged also: "Punitive damages can only be awarded where there has been actual malice, that is outrageous conduct or acts done with a bad motive and with a reckless indifference to others. Punitive damages are not essential in all cases. They may be awarded if the jury agree that all the tests have been met, but there should be no award of this item in the absence of the essential elements and if the jury does not think the circumstances warrant it. You must avoid being swayed by passion or prejudice in arriving at a figure for punitive damages if such are to be included in your verdict. Any punitive damages awarded must not be disproportionate to the actual damages suffered."

In spite of these cautionary words, the jury, undoubtedly in intellectual indignation over the treatment accorded the plaintiff by the defendant, brought in a verdict of $50,000 for punitive damages. The learned court below, in an able opinion, reasoned the justification of this award and we cannot say that it was not warranted in its rationalization. While in no way criticizing the jury or court for the verdict, we still believe that under all the circumstances, the punitive

damages may be reduced with justice to all parties concerned. Therefore, under the powers of review invested in this Court by the Act of May 20, 1891, P. L. 101, 12 PS §1164, the amount of the punitive damages is reduced to $30,000 (*Richette v. Pennsylvania R.R.*, 410 Pa. 6), making the total verdict for both compensatory and punitive damages $40,000.

The Court therefore affirms the order of the court below in refusing judgment n.o.v. and a new trial, and orders that judgment be entered in the total amount of $40,000.

Mr. Chief Justice BELL and Mr. Justice BENJAMIN R. JONES would affirm as to compensatory damages, but modify the judgment so as to exclude punitive damages.