378 A.2d 927

**Ronald K. BARTO, Donald J. Houser, Edward Peterson and Joseph D. Keppick, Plaintiffs-Appellants,**

v.

**John A. FELIX, Defendant-Appellee.**

Superior Court of Pennsylvania.

Argued March 22, 1977.

Decided Oct. 6, 1977.

Gary M. Lightman, Harrisburg, for plaintiffs-appellants.

Peter T. Campana, with him C. Edward S. Mitchell, Williamsport, for defendant-appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

This case is on appeal from the lower court's order sustaining appellee's preliminary objections in the nature of a demurrer to appellants' complaint. For purposes of appellate review, we must regard the allegations in appellants' complaint as true and accord them all the inferences reasonably deducible therefrom. *Allstate Insurance Co. v. Fioravanti*, 451 Pa. 108, 299 A.2d 585 (1973).

On March 1, 1974, Kim Lee Hubbard was found guilty by a jury of the murder of a twelve year old girl.[1] His privately retained counsel thereafter filed post-trial motions but withdrew from the case before perfecting an appeal. Defendant-appellee John A. Felix, a member of the public defender's office, was Hubbard's appellate counsel. After filing his appellate brief for Hubbard, appellee called a press conference at which he related the contents of the brief. The brief, and thus appellee's remarks at the press conference, contained defamatory material about appellants, who were state police officers involved in the investigation of the murder. The substance of appellee's remarks were published in at least two Lycoming County newspapers. As a

---

1. On January 28, 1977, the Supreme Court of Pennsylvania reversed Hubbard's conviction and remanded the case for a hearing on the effectiveness of Hubbard's post-trial counsel. *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).

result, appellants suffered grievous harm to their reputations and interference with the proper performance of their occupations. Appellants' complaint in trespass requested damages in excess of ten thousand dollars for each officer.

The lower court found that appellee was a "high public official" entitled to absolute immunity for defamatory utterances made in his official capacity. Furthermore, the court found that the remarks in this case were closely related to appellee's official duties and therefore were entitled to protection. Finally, the court held that appellee was absolutely privileged to repeat matters which were of public record.

Preparatory to analyzing the factual-legal particulars of this case, it will be useful to consider some of the fundamental precepts relating to immunity from civil liability for defamation.

*Judicial immunity* is granted to judges, lawyers, witnesses, and all others directly involved in a judicial proceeding to make comments relevant to the proceeding. The immunity is absolute[2] with respect to defamatory statements made in the pleadings or in the courtroom. *Greenberg v. Aetna Insurance Co.*, 427 Pa. 511, 235 A.2d 576 (1967), *cert. denied*, 392 U.S. 907, 88 S.Ct. 2063, 20 L.Ed.2d 1366 (1968). The immunity applies only to relevant statements made in an official capacity. *F. Harper and F. James, The Law of Torts* § 5.22 (1956).

A second, related type of immunity is that accorded to *high public officials.* Public interest demands that high public officials be absolutely immune from liability for defamatory statements made in the course of their official duties. A liberal construction is applied to determine whether an action falls within the official's duties. Thus, in

2. Absolute immunity differs from qualified immunity by the amount of protection afforded its possessor. Generally, a qualified immunity will not protect one who publishes defamatory statements knowing them to be untrue or in reckless disregard of the truth. *Restatement (Second) of Torts* § 600 (1977); *see Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A.2d 662 (1963). One who is absolutely immune is protected irrespective of the care or knowledge accompanying the publication.

*Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (1952), the State Attorney General was held to have an absolute privilege to make defamatory statements to a local district attorney concerning the qualifications of one of the district attorney's assistants.

The policy to be applied in determining the existence of this immunity is the importance of ensuring the public official's freedom to act in areas of public interest. The threat of a potential civil suit for damages would unquestionably dampen a public official's enthusiasm to act in certain situations, even though he entertained an honest belief that the public interest would be furthered by such actions. Public policy prefers that a public officer's decisions be uninfluenced by such considerations, even at the expense of an individual's priceless reputation. *Montgomery v. Philadelphia,* 392 Pa. 178, 140 A.2d 100 (1958).

A third type of immunity is based on the desirability of *keeping the public informed.* "When for the public good and interest of society a communication should be published it is said to be made on an 'occasion of privilege' and the defamatory statement is itself 'qualifiedly' or 'conditionally' privileged." *Montgomery v. Philadelphia, supra* 392 Pa. at 181, 140 A.2d at 102, *citing Restatement of Torts* § 593 (1938). *See also Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1963). It is obvious that this last type of immunity is much broader in scope than judicial immunity or the immunity accorded high public officials, and that more diverse policy considerations can enter into determining whether immunity is appropriate in a given situation. Note, however, that while judicial and high public official immunities are absolute, an immunity based on keeping the public informed is qualified only. *See* note 2, *supra.*

Of course, a public defender, just as any other attorney, is entitled to judicial immunity. Any official papers filed with the court or any remarks made at a judicial proceeding by a public defender would be absolutely privileged. However, judicial immunity does not protect the

public defender in this case, for the remarks made by him at the press conference were not made at a judicial proceeding. They did not fall within the sphere of activities which judicial immunity was designed to protect. *Restatement (Second) of Torts* § 586 comment c. (1977); *Harper and James, supra*, § 5.22. *Cf. Doe v. McMillan*, 412 U.S. 306, 314 n. 8, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) ("The republication of a libel, in circumstances where the initial publication is privileged, is generally unprotected.").[3]

This does not mean that appellee's remarks are entitled to no protection. A public defender necessarily enjoys the same qualified immunity that any other attorney (or any other individual) is accorded to publish information relative to a judicial proceeding. *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971); *Restatement (Second) of Torts* § 611 (1977); *Harper & James, supra*, § 5.24. However, judicial immunity does not extend to remarks made outside the judicial sphere.

We also hold that a public defender is not entitled to the absolute immunity of a high public official. In *McCormick v. Specter*, 220 Pa.Super. 19, 275 A.2d 688 (1971), this court considered the liability of a district attorney for defamatory statements made to the press. In that case, the court concluded that the "press conference was a proper undertaking of that office on the basis that the reasonable performance of the District Attorney's office warrants his informing the public of matters pending in that office. However, it must be emphasized that it is the public interest—not that of the official involved—which provides the rationale for the immunity." 220 Pa.Super. at 21–22, 275 A.2d at 689.

Appellee contends that a public prosecutor and a public defender enjoy identical status, citing *Brown v. Jo-*

---

3. In *McCormick v. Specter*, 220 Pa.Super. 19, 275 A.2d 688 (1971), this court held that remarks made by a public prosecutor at a press conference were absolutely privileged. However, the court's decision in *McCormick* was *not* based on judicial immunity. *McCormick* will be treated in greater detail *infra*.

*seph,* 463 F.2d 1046 (3d Cir. 1972). This argument is not without logical or legal support. *Brown v. Joseph, supra,* however, is distinguishable. In that case, the issue was whether a public defender is entitled to immunity in a suit brought by a former client under 42 U.S.C. § 1983. The Third Circuit Court of Appeals discussed several policy factors favoring immunity in that case which are inapplicable in the case before us.

To the extent that *Brown v. Joseph* is indistinguishable from this case, we disagree with it. The commentary to § 1.1 of the *ABA Project on Standards For Criminal Justice, The Prosecution Function* (Approved Draft, 1971), describes the prosecutor as an

> "administrator of justice. He is an administrator in the sense that he acts as a decision maker on a broad policy level and over a wide range of cases as director of public prosecutions. The prosecutor is in the best position to observe the work of the police in the investigation of crime and in the enforcement of the law. He has large responsibility in the decision whether to bring charges and, if so, what charges to bring against the accused, and the decision whether to prosecute or to dismiss charges, or to take other appropriate actions in the interest of justice. Since his is a large share of the responsibility for what cases are taken into the courts, the character, quality and efficiency of the whole system is shaped in great measure by the manner in which he exercises his broad discretionary powers."

The same cannot be said of a public defender. We recognize that the public interest is enhanced by the existence of a public defender's office, and a public defender is responsible to the community he serves no less than any other attorney. However, once appointed, the public defender's loyalty must be to his client, the indigent defendant. Unlike the public prosecutor, his services are rendered to the defendant, not to the public. Were we to distinguish between a public defender and a privately retained defense attorney, we would be doing a disservice to the public defender's

office in areas of far greater concern than the one presently before us. When asked whether a public defender is more like a public prosecutor or more like a privately retained attorney, we must unhesitatingly choose the latter.

The *ABA Project on Standards For Criminal Justice, supra,* makes an instructive distinction between the relationship of the public prosecutor and the press and the defense attorney and the press. Section 1.3(a) of *The Prosecution Function* provides that "[t]he prosecutor *should not exploit* his office by means of personal publicity connected with a case before trial, during trial and thereafter." (emphasis added) Section 1.3(a) of *The Defense Function* provides that "[t]he lawyer representing an accused *should avoid* personal publicity connected with the case before trial, during trial and thereafter." (emphasis added) Surely this distinction was not unintentional. The distinction is based on the recognition that a public prosecutor has a definite duty to report to the public. The public defender has no such duty. Thus, the official status of a public defender cannot be equated with that of the public prosecutor.

■ Finally, we must consider the dangers inherent in granting absolute immunity to a public prosecutor, yet not to his adversary. Trial by press is, unfortunately, an all too familiar expression. *See* Merrill, *The "People's Right to Know" Myth,* 45 *N.Y.St.B.J.* 461 (1973); Stanga, *Judicial Protection of the Criminal Defendant Against Adverse Press Coverage,* 13 *Wm. & Mary L.Rev.* 1 (1971); Comment, *Free Press v. Fair Trial: A Constitutional Dichotomy,* 20 *Loyola L.Rev.* 148 (1974); Comment, *Free Press vs. Fair Trial: Insulation Against Injustice,* 33 *La.L.Rev.* 547 (1973); Note, *Procedural Compromise and Contempt: Feasible Alternatives in the Fair Trial versus Free Press Controversy,* 22 *U.Fla.L.Rev.* 650 (1970). It can be imagined how much greater is the danger generated by widespread publicity if the defendant has no right of reply. *See* Note, *Defense Attorney's Reply in the Press to Prosecutor's Press Release Prejudicial to Client Held Not Privileged,* 111 *U.Pa.L.Rev.* 513 (1963).

However, we believe that the objective of protecting the defendant from unfair publicity is sufficiently effected by the qualified immunity to make comments relative to judicial proceedings that the public defender already enjoys. No public interest demands that a public defender be granted the privilege maliciously to publish untrue statements about others.

In appellants' complaint, it is alleged that appellee's statements at the press conference were known by him to be false, or were made in reckless disregard of the truth. If that allegation can be proved, appellee's qualified privilege will not protect him. Therefore, appellants' complaint stated a cause of action and should not have been dismissed. The order of the lower court is reversed and the case is remanded for proceedings consistent with this opinion.

SPAETH, J., files a dissenting opinion in which JACOBS, J., joins.

HOFFMAN, J., joins Part I of the dissenting opinion by SPAETH, J.

SPAETH, Judge, dissenting:

I believe that the lower court was correct in sustaining appellee's preliminary objections and in dismissing appellants' complaint, for two reasons: first, because appellee was immune by virtue of his position as Public Defender of Lycoming County; and second, because the statements allegedly made by appellee were absolutely privileged since they were made in the context of a judicial proceeding.

While the concepts of immunity and privilege have a common root, see Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. 463–490 & 599–616, they have developed in distinctive ways and therefore may best be dealt with separately.

I.

The immunity of a "high public official" from damage actions is based on the status of the defendant. If the

defendant was such an official, he will not be held liable for damages so long as his acts were within the scope of his official duties. The scope of the immunity is exceedingly broad. It includes not simply defamation actions but all civil actions for damages, *Jonnet v. Bodick*, 431 Pa. 59, 244 A.2d 751 (1968); *Matson v. Margiotti*, 371 Pa. 188, 88 A.2d 892 (1952), and the defendant's malice, or the extent of the damages the plaintiff has suffered, are unimportant. Thus in *Matson v. Margiotti, supra,* the Supreme Court said:

> *Absolute privilege*, as its name implies, is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, *provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority, or as it [is] sometimes expressed, within his jurisdiction.*

371 Pa. at 193–94, 88 A.2d at 895 (emphasis in original).

This sweeping immunity is not for the benefit of high public officials but for the benefit of the public. While an occasional official may regard the ability to commit a malicious tort with impunity as a perquisite of his office, this unfortunate consequence must be tolerated; the public's officials will be more likely to engage in the vigorous pursuit of the public welfare if they are not inhibited by the possibility of being liable for damages:

> [A]bsolute immunity is designed to protect the official from the suit itself, from the expense, publicity, and danger of defending the good faith of his public actions before a jury. And yet, beyond this lies a deeper purpose, the protection of society's interest in the unfettered discharge of public business and in full public knowledge of the facts and conduct of such business. Absolute immunity is thus a means of removing any inhibition which might deprive the public of the best service of its officers and agencies." Note, 20 U. of Chi.L.Rev. 677, 697 (1953). *Montgomery v. Philadelphia*, 392 Pa. 178, 183, 140 A.2d 100, 103 (1958).

To achieve this benefit to the public, the immunity must be absolute:

> It has been argued, however, that free disclosure would be sufficiently encouraged by the granting of a qualified privilege. But often a person will be deterred from making communications by the risk that a trier of fact may find against him, even if he has acted reasonably and without malice. Moreover, since a qualified privilege does not eliminate the necessity of litigating questions of fact, such as improper motive or unreasonable conduct, the time and money required for this defense would also deter free disclosure. And in the case of public officials, time would be taken from performance of duties which are of importance to the public. . . .

Note, Developments in the Law of Defamation, 69 Harv.L. Rev. 875, 917–18 (1956).

*See also, Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

While it is easy to define the scope of the immunity, it is not so easy to define who is a "high public official." The cases do not say who is and who is not, but rather reflect a case by case determination by a somewhat amorphous standard. Thus in *Montgomery v. Philadelphia, supra,* our Supreme Court said:

> It has been suggested that the determination of whether a particular public officer is protected by absolute privilege should depend upon the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions.

392 Pa. at 186, 140 A.2d at 105.

That this standard is somewhat amorphous may be seen from a review of some the officers held to be "high public officials"; the Attorney General, *Matson v. Margiotti, supra*; the Secretary of Highways (now Secretary of Transportation), *DuBree v. Commonwealth,* 8 Pa.Cmwlth. 567, 303 A.2d 530 (1973); *Fischer v. Kassab,* 25 Pa.Cmwlth. 593, 360 A.2d 809 (1976); a Township Supervisor, *Jonnet v. Bodick, supra*; a District Attorney, *McCormick v. Specter,* 220 Pa.

Super. 19, 275 A.2d 688 (1971); *Freach v. Commonwealth*, 23 Pa.Cmwlth. 546, 354 A.2d 908 (1976), *reversed on other grounds*, 471 Pa. 558, 370 A.2d 1163 (1977); an Assistant District Attorney, the Superintendent of the Parole Division of the Board of Probation and Parole, and the Superintendent of the Farview State Hospital, *Freach v. Commonwealth, supra*; the City Architect and the Deputy Commissioner of Public Property of the City of Philadelphia, *Montgomery v. Philadelphia, supra*; the State Police Commissioner and a State Police Captain in charge of a local troop, *Schroeck v. Pennsylvania State Police*, 26 Pa.Cmwlth. 41, 362 A.2d 486 (1976).

To the majority, the controlling factor seems to be whether an official has a duty to report his activities to the public. Majority Opinion at 931. As the foregoing review demonstrates, however, that is not a factor common to others afforded the immunity. *Cf. e. g.* a State Police captain in charge of a local troop. Nor should it be controlling, as the Supreme Court of the United States has made plain:

> That petitioner was not *required* by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.
>
> *Barr v. Matteo, supra*, 360 U.S. at 575, 79 S.Ct. at 1341 (emphasis in original).

It is much more important to consider the duties and responsibilities of the particular officer and how he might be impeded in their performance if the immunity is not extended to him. *Barr v. Matteo, supra*; *Freach v. Commonwealth*, 471 Pa. 558, 571, 370 A.2d 1163, 1170 (1977) (Concurring and Dissenting Opinion by Roberts, J.).

> In determining whether to extend absolute privilege to a communication by an official . . . a court should consider the importance of the particular job being per-

formed by the official and the extent to which its performance will be hampered by allowing only a qualified privilege.

Note, Developments in the Law of Defamation, 69 Harv.L. Rev. at 919.

It follows from these considerations that the immunity extended to "high public officials" should be extended to a Public Defender. The public's interest in providing—indeed, its duty to provide—free legal assistance to indigents accused of committing crimes will be better served by extending the immunity to a Public Defender than by not extending it. There is no justification for denying immunity to the Public Defender while extending it to his counterpart in the criminal justice system, the District Attorney. Such an imbalance can only make the Defender's office less attractive than the District Attorney's, and therefore less able to recruit qualified attorneys. Moreover, a Defender is particularly likely to be sued, for his clients are so often disappointed in the results of his efforts, and the threat of unwarranted civil actions by such ex-clients will encourage over-cautious policies in the Defender's office, at the expense of innovative and vigorous representation. This reasoning has convinced the federal courts that have considered the question that the immunity should be extended to a Public Defender:

We perceive no valid reason to extend this immunity to state and federal prosecutors and judges and to withhold it from state-appointed and state-subsidized defenders. Implicit in the extension of judicial immunity to prosecutors was the recognition of a public policy encouraging free exercise of professional discretion in the discharge of pretrial, trial, and post-trial obligations. Indeed, the very reasons advanced to assert that the Public Defender acts under color of state law because of the favorable comparison of his activities with those of public prosecutors, would *a fortiori*, support an argument in favor of the public defender on the immunity issue.

*Brown v. Joseph,* 463 F.2d 1046, 1048–49 (3d Cir. 1972) *cert. denied,* 412 U.S. 950, 93 S.Ct. 3015, 37 L.Ed.2d 1003 (1973).

*Accord, Minns v. Paul,* 542 F.2d 899 (4th Cir. 1976); *Waits v. McGowan,* 516 F.2d 203 (3d Cir. 1975); *John v. Hurt,* 489 F.2d 786 (7th Cir. 1973).

I admit to disappointment with the majority's narrow reasoning. Since immunity of "high public officials" is not limited to defamation actions but extends to all civil actions for damages, *Jonnet v. Bodick, supra* ; *Matson v. Margiotti, supra,* the denial of the immunity must be as broad. While the majority has discussed only the reasons why the immunity should not be extended in the context of a defamation action (concededly the basis for the action in the present case), its denial of the immunity will affect other sorts of actions. In the federal cases the issue has arisen in the context of an action under 42 U.S.C. § 1983, it being alleged that a Public Defender, acting in his capacity as a public officer (*see* Pa.Const. Art. 9 § 4), has deprived a client of the right to competent legal representation. *Brown v. Joseph, supra*; *Minns v. Paul, supra*; *John v. Hurt, supra.* While the grant of immunity by the federal courts prohibits these actions, the rule announced by the majority today will merely transform the actions into state law claims for damages for negligent representation.

Consider, for example, *Reese v. Danforth,* 241 Pa.Super. 604, 360 A.2d 629 (1976). There this court affirmed *per curiam* the dismissal of an action against an Assistant Public Defender and a law clerk in the Defender's office. The complaint alleged that the defendants had negligently defended the plaintiff in an involuntary commitment proceeding under the Mental Health and Mental Retardation Act of 1966, Act of Oct. 20, 1966, Special Sess. No. 3, P.L. 96, art. I, § 101 *et seq.,* 50 P.S. § 4101 *et seq.* Among other things, it was alleged that the defendants had permitted the introduction of hearsay evidence. The lower court dismissed the complaint on the ground that the defendants were protected by immunity, citing *John v. Hurt, supra,* and *Brown v.*

*Joseph, supra.* Under the majority's decision today, a Public Defender and members of his office must defend such suits, and may be held liable for damages, so long as the complaint alleges malice.

Perhaps the majority intends this result, but I should find it reassuring had the competing policy considerations been discussed. The issue is not as the majority has chosen to frame it, whether ". . . public interest demands that a public defender be granted the privilege maliciously to publish untrue statements about others." Majority Opinion at 271. This statement mistakenly regards the immunity as a perquisite of office, and fails to recognize it as a doctrine to protect the public. The proper way to frame the issue is to ask whether the public interest demands that a public defender be required to answer any and all civil actions arising out of the performance of his duties, simply because the actions contain an allegation of malice. For my part, I am persuaded, with the federal courts, that the public interest does not demand this result, but will be best served by protecting the Defender from such actions.

The unstated premise of the majority's reasoning appears to be a fear that if immunity were granted, no punishment would be available to deter a Public Defender from the commission of intentional torts. Of course there is nothing to suggest that Public Defenders as a class are more likely tortfeasors than are officials who enjoy the immunity. In any event, there are available a number of remedies to deter a Defender from the commission of intentional torts. Upon finding that a Defender has committed an intentional tort, the Board of County Commissioners may fire him. *See* the Public Defender Act, Act of Dec. 2, 1968, P.L. 1144, No. 358, § 4; 16 P.S. § 9960.4. Moreover, such conduct would violate the Canons of Ethics and the Rule of Disciplinary Enforcement, 20 Pa.Code, Chap. 101, and be grounds for disbarment, which would also result in removal from the office of Public Defender. 16 P.S. § 9960.5(c). These remedies are at least as effective to prevent misbehavior as any remedies available against others granted immunity as "high public officials."

## II.

An alternative reason for affirming the dismissal of appellants' complaint is that the statements allegedly made by appellee were absolutely privileged since they were made in the context of a judicial proceeding. This privilege, unlike the immunity of high public officials, is not based upon the status of the speaker but on whether the statements were made in the context of a judicial proceeding.[1] The scope of the privilege also differs from the scope of the immunity, for by its nature it is generally limited to defamation actions. *See* Veeder, Absolute Immunity in Defamation: Judicial Proceedings, *supra.*

The privilege is based on the policy that all parties, the witnesses, the judge, and the jurors, should be encouraged to speak frankly before the court, free of concern that they may later have to defend their statements in a defamation action. At first the privilege extended only to formal pleadings. *Kemper v. Fort*, 219 Pa. 85, 67 A. 991 (1907); *Yearsley v. Franklin Lamp Mfg. Co.,* 97 Pa.Super. 538 (1930). Later, however, it became clear that it extended to all statements made in a judicial proceeding. *Nagle v. Nagle*, 316 Pa. 507, 175 A. 487 (1934). The privilege is absolute, and includes a malicious defamation. *Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 275 A.2d 53 (1971). The sole qualification is that the statements must be relevant to the proceedings. *Greenberg v. Aetna Insurance Co.,* 427 Pa. 511, 235 A.2d 576 (1967), *cert. denied,* 392 U.S. 907, 88 S.Ct. 2063, 20 L.Ed.2d 1366 (1968).

The majority concludes that appellee's statements were made outside the scope of the judicial proceeding and therefore are not within the privilege. While the question is a close one, within the facts of this case I disagree.

Appellee had been appointed to represent Kim Lee Hubbard in the preparation of a post-conviction attack on Hubbard's conviction for murder. The case involved a particu-

1. Other proceedings may be afforded similar protection, *e. g.,* legislative hearings. *See* Restatement (Second) of Torts § 590A (1977). Here we need only consider a judicial proceeding.

larly brutal attack on a 12 year old girl.[2]  As is predictable when such a murder occurs in a rural county, a significant amount of publicity surrounded the criminal proceedings against Hubbard, including the post-conviction proceedings. Statements made to the press by appellee concerning the case form the basis for the present defamation action. All appellants were state police officers who were involved in the investigation of the murder. The complaint alleges that appellee's statements were defamatory in that they were made maliciously and accused appellants of improprieties during the course of the investigation. Shortly before the statements appellee had filed a brief with the lower court in support of his client's post-conviction petition. The lower court has found in its opinion, and it is not disputed by appellants, that the statements "[were] no more than a reiteration of the contents of that Brief." Slip Opinion at 6.

There is no question that the privilege extends to the brief itself; it was filed with the court in a pending proceeding, and allegations of impropriety on the part of investigating law enforcement officers are relevant to a challenge of a murder conviction. *Greenberg v. Aetna Insurance Co., supra.* There is also no question that the newspaper reports of appellee's statements were themselves not actionable; they were reporting a noteworthy development in a case of wide community interest. *Mengel v. Reading Eagle Co.,* 241 Pa. 367, 88 A. 660 (1913). The sole question is whether appellee's "reiteration of the contents of [his] [b]rief" may form the basis of a defamation action. The majority holds that the reiteration amounted to a "republication" of the privileged statements in the brief, and since this was outside the scope of the judicial proceedings, the privilege was lost. Concededly, the majority's position is supported by precedent in other jurisdictions. *Washer v. Bank of America National Trust & Savings Assn.,* 21 Cal.2d 822, 136 P.2d 297 (1943); *Murray v. Brancato,* 290 N.Y. 52, 48 N.E.2d 257 (1943); *see also,* Note, Developments in the Law of Defama-

2. For a detailed discussion of the facts of *Hubbard's* case, *see Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (filed Jan. 7, 1977).

tion, 69 Harv.L.Rev. at 922. However, I am of the opinion that at least in this case those precedents should not be followed. The problem I see is that of defining precisely what is the prohibited republication. Since the statements could properly be made in the brief and in the newspapers, it is the act of supplying the statements in the brief to the newspapers that is held impermissible. However, once filed with the court the brief was public information. (There is no indication that any "gag orders" were imposed upon the parties by the court.) The newspapers presumably could have asked the Prothonotary to permit them to see the brief, or they might have asked appellee to give them a copy, which he might have done without making any comment. As I understand the majority's reasoning, both of these hypothetical situations would be considered prohibited republication. To me, however, they both represent legitimate methods of furnishing to the public information that is of record, and both are indistinguishable from the present case. I would therefore construe the privilege to include appellee's activity here.

The order of the lower court should be affirmed.

JACOBS, J., joins in this opinion.

HOFFMAN, J., joins in Part I of this opinion.